# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

January 15, 2014

**Before**

WILLIAM J. BAUER, *Circuit Judge*

JOEL M. FLAUM, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 12-2471

FH-T,

                                                                    *Petitioner*,

*v.*

ERIC J. HOLDER, JR., ATTORNEY
GENERAL OF THE UNITED STATES,

                                                                    *Respondent*.

---

Petition for Review of an Order of the
Board of Immigration Appeals.
No. 12-2471

---

**O R D E R**

On consideration of the petition for rehearing and petition for rehearing en banc[*] filed by petitioner in the above case on September 6, 2013, a majority of active judges voted to deny rehearing. Chief Judge Wood, Circuit Judges Posner, Rovner and Hamilton voted to grant en banc rehearing. Chief Judge Wood has written an opinion, which Judges Posner, Rovner and Hamilton have joined, dissenting from the denial of the petition.

---

[*] Circuit Judge Ann Claire Williams did not participate in the consideration of this petition.

WOOD, *Chief Judge,* with whom POSNER, ROVNER, and HAMILTON, *Circuit Judges,* join, dissenting from the denial of rehearing *en banc.*

One cannot read the panel opinion in this case without appreciating how difficult the issues are, and how troubled the panel was with the outcome that it believed it was required to reach. I agree with the panel's conclusion that petitioner FH-T failed to exhaust his argument about the "knowledge exception" to the bar for asylum that applies to persons who provided material support to a terrorist organization. But I cannot subscribe to the panel's conclusion that it was powerless to do anything about the procedural dead end in which a person like FH-T finds himself—unable to receive an answer from the Board of Immigration Appeals on the question whether he is eligible for asylum apart from what I will call the terrorism bar, yet unable to obtain a determination from the Department of Homeland Security on an application for a waiver of the terrorism bar without a decision from the BIA. The panel suggests at the end of its opinion (sl. op. at 33) that this is a problem that can be solved only by Congress. In my view, however, the problem is regulatory in both its creation and its solution: we have an instance of two agencies (the Department of Justice, through its Executive Office of Immigration Review, and the Department of Homeland Security) that have thwarted the congressional scheme through their regulatory apparatus. Legislative intervention is not necessary to empower these two Executive departments to solve a problem of their own making. To the

contrary, there are a number of ways in which they could come into compliance with the statutory framework. I outline a few of them below. The proper procedure for adjudicating terrorism-bar cases is important enough on its own to justify the attention of the full court. But there is more here: this case raises the general problem (which we have seen elsewhere in immigration cases) of assuring that agency regulations do not defeat rights found in statutes. *Cf. Kucana v. Holder*, 558 U.S. 233 (2010) (refusing to extend proscription against judicial review of decisions made discretionary by statute to those made discretionary by regulation). I believe that this case is worth the attention of the *en banc* court, and so I respectfully dissent from the decision not to set it for rehearing.

A quick review of the underlying facts and pertinent legal materials is helpful to put my concerns in context. FH-T is an Eritrean citizen. Here is what the CIA's World Factbook has to say about Eritrea:

> The UN established Eritrea as an autonomous region within the Ethiopian federation in 1952. Ethiopia's full annexation of Eritrea as a province 10 years later sparked a violent 30-year struggle for independence that ended in 1991 with Eritrean rebels defeating government forces. Eritreans overwhelmingly approved independence in a 1993 referendum. Isaias Afworki has been Eritrea's only president since independence; his rule,

> particularly since 2001, has been highly autocratic and repressive. His government has created a highly militarized society by pursuing an unpopular program of mandatory conscription into national service, sometimes of indefinite length.

https://www.cia.gov/library/publications/the-world-factbook/geos/er.html (last visited Jan. 15, 2014). At the age of 15, FH-T joined the Eritrean People's Liberation Front (EPLF) and was quickly swept up in that violent war for independence. He regretted his decision almost immediately, but he discovered that he was not free to leave, and he thus remained with the EPLF for the duration of the war. During that time, FH-T's duties included driving a truck to distribute food and clothing and transferring calls and requests for truck parts.

After the war ended, the EPLF transformed itself into a political party, the People's Front for Democracy and Justice (PFDJ), and Isaias Afworki was named president by a transitional legislature. Unfortunately, this did not herald the adoption of a democratic form of government. To the contrary, "the constitution, ratified in May 1997, did not enter into effect, pending parliamentary and presidential elections; parliamentary elections were scheduled in December 2001 but were postponed indefinitely; currently the PFDJ is the sole legal party and controls all national, regional, and local political offices." World Factbook, *supra*. In connection with the EPLF's re-branding as a political

party, FH-T found himself in the mandatory national service referenced above, where he was assigned to work as a transportation supervisor for a state-owned company. He repeatedly spoke out against the "national service" program, which supposedly required 18 months of service, but in reality often amounted to indefinite compulsory work. The PFDJ was not amused: it imprisoned FH-T in a military camp for five months under horrendous conditions; he became seriously ill and lost 30 pounds. At the end of that period, he was released without having been charged with any wrongdoing. He was forced to return to his old job, but he was not permitted to do any work, and in exchange he received no pay. In 2007, when he heard of a possible governmental attempt to kill him, he fled to the United States and filed for asylum. After his departure, his father and sister were arrested.

FH-T's asylum application prompted DHS to issue a Notice to Appear on August 15, 2007, which had the effect of putting him into removal proceedings. It is important to note that DHS (through its Citizenship and Immigration Service, or CIS) takes care of most applications for waiver of the terrorism bar administratively—that is to say, without the involvement of an Immigration Judge or the BIA. See statistics at http://www.rcusa.org/uploads/pdfs/TRIG%20stat s%20(only),%206-5-12.pdf (last visited Jan. 15, 2014) (cited in Petition for Rehearing En Banc at 12 n.8). We are not concerned in this case with the set of cases that are handled exclusively by DHS; our problem is with the smaller, but important, group of cases in which the noncitizen has been

placed within formal removal proceedings. The latter cases are handled by the Executive Office for Immigration Review in the Justice Department.

The IJ denied FH-T's applications for asylum and withholding of removal, but he did grant deferral of removal under Article III of the U.N. Convention Against Torture, 1465 U.N.T.S. 85 (1984), which the United States has signed. The IJ found that FH-T's account of his knowledge of the EPLF's activities was not credible, that FH-T had failed to establish his eligibility for asylum, and that he was statutorily ineligible for withholding of removal because he had provided material support to the EPLF, which the IJ characterized as a Tier III terrorist organization for purposes of 8 U.S.C. § 1182(a)(3)(B)(vi)(III). (As the panel points out, sl. op. at 9–10, terrorist organizations fall into several tiers: DHS designates the Tier I groups, and the Department of State designates the Tier II groups. Tier III is more flexibly defined and there is no formal list of such organizations; among others, the IJs have the authority to decide if a group fits the Tier III definition.)

It is the BIA's opinion affirming the IJ's ultimate conclusions that is critical for our purposes. The BIA noted that FH-T did not challenge the finding that the EPLF was a Tier III terrorist organization; I agree with both the Board and with the panel that this issue is not before us. FH-T stressed instead his assertions that the support he provided for the EPLF was not material and that he had no knowledge of the group's terrorist activities. Like the IJ, the BIA found

no merit in these arguments. The BIA concluded with the following statement and footnote (emphasis added):

> As the respondent [FH-T] is barred from asylum and withholding of removal [because of the terrorism bar], *we need not address the other arguments on appeal* regarding the merits of the respondent's claim of persecution in Eritrea on account of actual or imputed political opinion. [Footnote 1: To the extent that the respondent has argued his possible eligibility for a waiver under section 212(d)(3)(B)(i) of the Act [8 U.S.C. § 1182(d)(3)(B)(i)], we note that the Secretary of State has the sole authority to grant this waiver, and this provision does not affect the disposition of the instant removal proceedings.]

In fact, the Board's assumption that only the Secretary of State is empowered to grant a waiver of the terrorism bar was incorrect. The statute provides as follows:

> The Secretary of State, after consultation with the Attorney General and the Secretary of Homeland Security, *or the Secretary of Homeland Security*, after consultation with the Secretary of State and the Attorney General, may determine in such Secretary's sole unreviewable discretion … [that a waiver should be granted].

8 U.S.C. § 1182(d)(3)(B)(i) (emphasis added).

In fact, the Secretary of State loses his power to grant a waiver once removal proceedings have begun, see *id.*, and the Secretary of Homeland Security takes responsibility for many, if not most, of these waivers. On October 23, 2008, Homeland Security, through CIS, issued a document entitled "Fact Sheet: Department of Homeland Security Implements Exemption Authority for Certain Terrorist-Related Inadmissibility Grounds for Cases with Administratively Final Orders of Removal." The Fact Sheet indicates that the Secretary of Homeland Security had begun as of September 8, 2008, to implement his exemption authority under § 1182(d)(3)(B)(i) "for cases issued administratively final orders of removal by the Department of Justice (DOJ), Executive Office for Immigration Review (EOIR)." The Fact Sheet sets out two prerequisites for the Secretary's consideration: (1) the order of removal must be "administratively final"—in other words, the BIA must have affirmed the order or the period for seeking review before the BIA must have expired; and (2) for those not in custody, the exemption petition will be forwarded to CIS "if relief or protection was denied *solely* on the basis of one of the grounds of inadmissibility for which exemption authority has been exercised by the Secretary." For those in custody, the Fact Sheet similarly states that the individual must "otherwise [be] eligible for consideration." It is no mystery why DHS would choose to insist that all other issues be resolved before the Secretary considers an exemption

petition; there is no need for him to waste his resources if the petitioner could still be removed on independent grounds.

Proper resolution of this case also requires us to look at the key statutes. First is 8 U.S.C. § 1182(a)(3)(B) (§ 212(a)(3)(B) of the Act), which designates as "ineligible to receive visas and ineligible to be admitted to the United States" any alien who has engaged in terrorist activities. Section 1182(a)(3)(B)(vi) defines the term "terrorist organization" by classifying such organizations into three tiers. The one relevant here is subsection III, which speaks of "an organization … that is a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, the activities described in subclauses (I) through (VI) of clause (iv). Those activities range from murder, to gathering information, to soliciting funds for the terrorist organization, to solicitation of membership in the group. The rule of § 1182(a)(3)(B) is not absolute, however. Section 1182(d)(3)(B)(i) confers authority on either the Secretary of State, in consultation with the Attorney General and the Secretary of Homeland Security, or the Secretary of Homeland Security, in consultation with the other two, to "determine in such Secretary's sole unreviewable discretion that subsection (a)(3)(B) of this section shall not apply with respect to an alien within the scope of that subsection … ." And, critically for our case, Congress provided for judicial review of legal issues that may arise in conjunction with waiver determinations:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of Title 28, *no court shall have jurisdiction to review* such a determination or revocation *except in a proceeding for review of a final order of removal* pursuant to section 1252 of this title, and *review shall be limited to the extent provided in section 1252(a)(2)(D)* of this title. The Secretary of State may not exercise the discretion provided in this clause with respect to an alien at any time during which the alien is the subject of pending removal proceedings under section 1229a of this title.

8 U.S.C. § 1182(d)(3)(B)(i) (emphasis added). In summary, Congress has (1) created a rule forbidding certain aliens who are or were associated with terrorist activities from being admitted to the United States; (2) created an exemption from that rule, to be awarded solely in the discretion of the Executive Branch; but it has (3) permitted judicial review of legal issues that might arise in connection with the exercise of the exemption authority. Indeed, one could argue that the last sentence in the excerpt just above indicates that the Secretary of State (and by inference also the Secretary of Homeland Security) must await the conclusion of removal proceedings before making an exemption decision. At a minimum, the final sentence means that only the Secretary

of Homeland Security may act once removal proceedings have commenced.

Nowhere in this statutory scheme can one find a command from Congress that authorizes or compels the BIA to refrain from deciding issues that might influence the removability of an alien before it. Normally, it is up to the BIA to decide how many issues it should reach on an appeal from an IJ, just as this court often chooses not to reach arguments that a party has made if the case can rest on another ground. But "normally" does not mean always. If the operation of a different statute depends on a finding of fact or a conclusion of law from the BIA, then it is up to the BIA to devise administrative procedures that will assure that it performs its duty. No statute, to my knowledge, forbids the Board from creating a structure that will ensure that the Board does not effectively deprive a noncitizen in FH-T's position from seeking a waiver before DHS.

It is at this point, in my view, that the considerable line of cases disapproving agency procedures that defeat an alien's right to obtain a merits determination on a ground for withholding removal becomes relevant. In *Subhan v. Ashcroft*, 383 F.3d 591 (7th Cir. 2004), the noncitizen had applied for adjustment of status under a statute that permitted him to receive that benefit if he was certified as eligible for employment in the United States. He received two continuances, but then the IJ denied him a third. We held that this denial had the effect of barring him from relief that Congress had authorized: "When a request for an

adjustment of status is denied there is no judicial review because the denial is one of the discretionary orders expressly made nonreviewable by section 1252(a)(2)(B). But no discretion was exercised here to deny a requested adjustment of status; instead, the denial of the continuance prevented the alien from obtaining action on his request." We found it "unlikely that Congress, intending, as it clearly did, to entitle illegal aliens to seek an adjustment of status upon the receipt of certificates from the state and federal labor departments, at the same time also intended section 1252(a)(2)(B)(ii) to place beyond judicial review decisions by the immigration authorities that nullified the statute." *Id.* at 595.

*Benslimane v. Gonzales*, 430 F.3d 828 (7th Cir. 2005), offers another application of the same principle. Benslimane had originally entered under a visitor's visa and overstayed, but later his spouse applied on his behalf for a spousal visa and he sought adjustment of status. His removal proceeding went forward nonetheless, and at one point his lawyer erred by failing to submit the adjustment of status request to the IJ (thinking that it could not be filed there until it had been adjudicated). The IJ denied a continuance and ordered Benslimane removed. This court ruled that the decision to deny a continuance was reviewable because it "had the effect of a substantive ruling on the application to adjust his status … ." *Id.* at 832. Writing more broadly, we said that "[a]n immigration judge cannot be permitted, by arbitrarily denying a motion for a continuance without which the alien cannot establish a ground on which Congress has

determined that he is eligible to remain in this country, to thwart the congressional design." *Id.*

Finally, in *Ceta v. Mukasey*, 535 F.3d 639 (7th Cir. 2008), we faced a situation in which an Albanian citizen was seeking asylum in the United States. He was concededly removable, and his application for asylum had been denied, but he was also seeking adjustment of status on the basis of his marriage to an American citizen. Under the regulations in force when he applied, he was ineligible for adjustment of status, but during the pendency of his appeal to the BIA, DHS and the Attorney General issued an interim rule providing that applicants for adjustment had to apply with CIS whether or not they were in removal proceedings. The IJ, however, denied Ceta a continuance that would have permitted him to pursue that avenue. This court found that the "BIA's affirmation of [the denial of] Mr. Ceta's request for a continuance amounts, under the circumstances of this case, to a denial of his statutory right to apply for adjustment of status." *Id.* at 646. He had become, we said, "trapped within a regulatory interstice" because he had a statutory right to apply for adjustment of status but he would be removed before CIS could adjudicate his application.

I recognize that there are distinctions to be drawn between these cases and FH-T's, such as the procedural posture or the details of statutory language. But none of these differences overcomes the relevant similarity: in each of these three cases, the alien had a statutory right to seek a form of relief, and the immigration agencies erected a

regulatory barrier to the opportunity to seek the relief in question. The same situation exists here. FH-T has a statutory right to seek a waiver of the terrorism bar, but between them, the EOIR and DHS have created regulatory barriers that made it impossible for him to place his case before the Secretary of Homeland Security and obtain a "yes" or "no" answer. I am not persuaded by the panel's opinion that we can or should accept that answer.

I conclude with two points. First, it is premature to worry about relieving FH-T from any consequences that flow from the existence of a "final removal order." Finality is one of the criteria that DHS has identified as necessary before it will entertain an exemption request. Just because there is a final order of removal does not mean that a bag-and-baggage letter is coming along imminently. Those letters are within the control of DHS anyway, and I would hope that one arm of the agency can find a way to ensure that it does not nullify what another arm of the agency is doing. FH-T, to this extent, is asking for more than we need to address right now. If such a letter were to arrive before he obtains his answer from DHS, I presume that his attorney would seek an emergency stay, and we would have a better record on which to consider the facts and the equities. Second, although I believe that the agencies here have stumbled into a system that impermissibly nullifies rights that Congress has created, I am not suggesting that the solution is to have courts micromanage the proper fix. One possible answer would be to insist that the BIA adjudicate all issues that might stand in the way of an exemption from the terrorism

bar, in cases where it is an issue; another possible "fix" would be for DHS to change the policy expressed in the Fact Sheet and to state that it will adjudicate all exemption requests in cases where there is a final BIA order (or its equivalent), regardless of how many issues the BIA reached. And there may be others; it is up to the agencies to decide how they want to solve this problem. The one thing they cannot do, however, is to adopt a system that flies in the face of statutory rights.

For these reasons, I dissent from the decision not to hear this case *en banc*.