In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 13-2106 & 13-3385

SAMI ULLAH KHAN,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR.,
Attorney General of the United States,

*Respondent*.

Petitions for Review of Decisions
of the Board of Immigration Appeals.
No. A098-157-095

ARGUED NOVEMBER 7, 2013 — DECIDED SEPTEMBER 4, 2014

Before BAUER, MANION, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. Sami Ullah Khan seeks review of a decision of the Board of Immigration Appeals ("BIA") applying the "terrorism bar," 8 U.S.C. § 1182(a)(3)(B)(i)(I), a broad barrier to admissibility into the United States. Underneath the surface is an important legal question about the proper

interpretation of an exception to the bar, but we can't reach it because it wasn't properly preserved for review.

Khan is a Mohajir, which means that his parents were immigrants into Pakistan when it was partitioned from the British Indian Empire in 1947. Some Mohajirs formed a political party—the Mohajir Qaumi Movement—in response to perceived repression by nonimmigrant locals. Khan joined in 1992 when he was 14 or 15 years old. He distributed flyers, attended meetings, and recruited people to the cause. The group became increasingly violent, however, and many Mohajirs, including Khan, left to join a new, supposedly more peaceful group called MQM-Haqiqi. But this party too resorted to violence, so Khan eventually left it as well.

Khan's switch had made him a target, and he was repeatedly attacked by members of the first party, including beatings and death threats. On two occasions he was kidnapped and tortured. He eventually fled to the United States on a visitor visa, and when it expired, he asked for asylum and other forms of relief from removal. While his case was pending, he married a United States citizen, making him eligible for permanent residency through his marriage.

The government opposed Khan's admission to the United States, arguing that he was ineligible for having engaged in terrorist activity by supporting both factions of the Mohajir Qaumi Movement. An immigration judge ("IJ") accepted the government's position and the BIA affirmed. Khan petitioned for review, raising many issues, but he failed to preserve the strongest argument he had, which centers on whether he knew

that the MQM factions authorized terrorism during the time he was a member. Accordingly, we deny the petition for review.

## I. Background

A portion of the Immigration and Nationality Act provides that any alien who has "engaged in a terrorist activity" is ineligible for admission into the United States. 8 U.S.C. § 1182(a)(3)(B)(i)(I). Terrorist activity is defined expansively to include "commit[ting] an act that the actor knows, or reasonably should know, affords material support" to a terrorist organization. *Id.* § 1182(a)(3)(B)(iv)(VI). The knowledge requirement only applies to the actor's awareness that he is providing material support. The knowledge required with respect to a group's status as a terrorist organization depends on how it's categorized. Terrorist organizations are divided into three tiers: Tier 1 and 2 organizations are determined by the Secretary of State and published in the Federal Register, while Tier 3 organizations are any others that engage in terrorist activities. *Id.* § 1182(a)(3)(B)(vi).[1] If an alien gave

---

[1] Tier 1 organizations are determined by the Secretary of State in accordance with 8 U.S.C. § 1189. *See* 8 U.S.C. § 1182(a)(3)(B)(vi)(I). For a list, see *Foreign Terrorist Organizations*, U.S. DEP'T OF STATE, http://www.state.gov/j/ct/rls/other/des/123085.htm (last visited Sept. 4, 2014). Tier 2 organizations are determined "by the Secretary of State in consultation with or upon the request of the Attorney General or the Secretary of Homeland Security." *See* 8 U.S.C. § 1182(a)(3)(B)(vi)(II). For a list, see *Terrorist Exclusion List*, U.S. DEP'T OF STATE, http://www.state.gov/j/ct/rls/other/des/123086.htm (last visited Sept. 4, 2014). (Although the page is dated December 29, 2004, it

(continued...)

material support to a Tier 1 or Tier 2 organization, he is barred from entry regardless of whether he knew it was a terrorist organization. *Compare id.* § 1182(a)(3)(B)(iv)(VI)(cc) *with* (dd). However, if a group is in Tier 3, the alien has an opportunity to "demonstrate by clear and convincing evidence that [he] did not know, and should not reasonably have known, that the organization was a terrorist organization." § 1182(a)(3)(B)(iv)(VI)(dd). This is known as the "knowledge exception" to the material support bar we just described.

*      *      *

The Mohajir Qaumi Movement first became a political party in the mid 1980s and quickly rose to prominence in Pakistani politics. It formed an early coalition with the dominant political party, but the relationship soured, leading to conflict and often violent confrontations. In 1992 the military initiated "Operation Clean-up" aimed at purging the City of Karachi of terrorists, though many Mohajirs viewed it as a disguised attempt to suppress the Mohajir Qaumi Movement. *See Operation Clean-up*, WIKIPEDIA, http://en.wikipedia.org/wiki/Operation_Clean-up (last visited Sept. 4, 2014). Around the same time, disagreements between the movement's leaders led to the formation of an offshoot faction. The new group

---

[1] (...continued)
reflects the removal of the Communist Party of Nepal from the list in 2012.) There is no formal list of Tier 3 terrorist organizations. *See FH-T v. Holder*, 723 F.3d 833, 839 n.2 (7th Cir. 2013). Immigration courts can decide on a case-by-case basis whether a group fits the definition. *See FH-T v. Holder*, 743 F.3d 1077, 1079 (7th Cir. 2014) (Wood, C.J., dissenting from the denial of rehearing en banc).

called itself MQM-Haqiqi, or "the *real* Mohajir Qaumi Movement." (The original party became known as "MQM-A." From this point forward, we will also use this name to refer to the party before the split. We will occasionally use "MQM" to refer to both factions.) The military supported the new group in an effort to undermine MQM-A. *See* Farhat Haq, *Rise of the MQM in Pakistan: Politics of Ethnic Mobilization*, 35 ASIAN SURV. 990, 1001 (1995), *available at* http://www.jstor.org/stable/265723. During the military's clean-up operation, which continued until 1994, MQM-H campaigned to convince party activists that MQM-A had become a terrorist organization. *Id.* Ever since the division of MQM into these two factions, members of both groups have frequently violently clashed. *See* U.S. DEP'T OF STATE, U.S. DEPARTMENT OF STATE COUNTRY REPORT ON HUMAN RIGHTS PRACTICES 1994–PAKISTAN (Jan. 30, 1995), *available at* http://www.refworld.org/docid/3ae6aa7c14.html (noting that "people were killed almost daily in fighting among factions of the MQM"). Because of this violence, MQM-H has been identified as a Tier 3 terrorist organization. *See Hussain v. Mukasey*, 518 F.3d 534 (7th Cir. 2008) (upholding the BIA's finding that MQM-H's activities in the early 1990s qualify it as a terrorist organization).

*            *            *

Khan joined MQM-A in 1992 when he was 14 or 15 years old.[2] He believed, like many in his neighborhood, that the

---

[2] The only witnesses who testified at Khan's removal hearing were Kahn himself and three of his relatives. The government presented 30-some

(continued...)

organization existed to fight for the rights of Mohajirs and to improve their education and employment opportunities. He was also upset by the injustice of the military's clean-up operation. Khan distributed flyers and signs, attended meetings, and recruited others in his neighborhood. Over time, however, Khan became aware of increasing violence by members of the party. In his words, MQM activists started engaging in "anti-state, anti-social, and anti-people activities." Gangsters and criminals "took control of the party and the streets." When he saw that "[MQM-A] leaders were aware of what was going on but remained silent," he realized that "the entire mission, cause and objective of the party was changed." Khan says that this "came as a shock/surprise to Mohajirs and their supporters, including me," and that he viewed it as a "betrayal[] of the Mohajir cause."

In 1994 Khan, like many Mohajirs, left to join MQM-H, the offshoot faction. The new leaders "assured [Mohajirs] that the party will fight for their just cause," so Khan joined "with the strong belief and firm consideration that the [MQM-H] leaders are trusted leaders of Mohajirs and their cause to defend Mohajir's struggle is legitimate." Khan's work with MQM-H remained largely the same; he posted signs and flyers,

---

[2] (...continued)
articles and reports on both of the MQM factions and the conditions in Karachi. The IJ noted that the reports were "largely consistent with [Khan's] account." The IJ did not find that Khan lacked credibility, and the government has never argued that Khan or his relatives lied or misrepresented his past. Therefore, we assume, like everyone else appears to, that his account is both truthful and accurate.

recruited others, attended meetings, staffed the local office in the evenings, and organized grocery requests for those in need.

But over time Khan began to realize that MQM-H was also engaging in violence. "In the beginning they were doing good things, but later on, gradually, they started doing the same things as [MQM-A]." So in 1997 Khan significantly scaled back his involvement. "As soon as I came to know that these both groups are getting violent, and when they are clashing, I stopped working for them, and I stopped attending their meetings and kept myself aloof from them." He did not cut off his ties entirely, though. He explained: "I had to slow down my activities, but because I was staying in that locality and that street[,] … they used to ask me to go with them and work for them." When asked whether he worked for MQM-H, even after becoming aware of fighting between the factions, Khan responded: "I used to support them, but I never … worked for them or interfered with their work or what they were doing." He clarified what he meant by support: "What I mean is that in our street, since everybody was from [MQM-H], they used to meet us and ask questions about us. So, I have to express myself as a supporter, that yes, I am. But I really slowed down my work and didn't do anything for them." The government specifically questioned him about his attendance at meetings, and Khan admitted that for the next three years he still attended meetings when asked to. "I had to attend the meeting when their higher-ups of the party used to come … and call everybody or call me for attending the meeting."[3]

---

[3] There is a discrepancy between Khan's testimony at trial and his written

(continued...)

Khan's switch in 1994 had turned the wrath of MQM-A against him. He testified that MQM-A members began hunting down MQM-H activists and either killing or torturing them. "Threats to punish and kill starting pouring in against my family and me." One of Khan's cousins was shot and killed. In the summer of 1999, six MQM-A members, armed with guns, knives, iron rods, and hockey sticks, broke into the MQM-H office during a meeting. They dragged Khan out into the street and beat him. He was thrown into the bed of a pickup truck, driven to an MQM-A torture cell, and beaten for two days before he was released.

The scene worsened in the fall of 1999 when Pervez Musharraf seized control of the country by military coup. The previous government had supported and protected MQM-H, but the new government favored MQM-A. With their protection gone, the attacks against MQM-H intensified. In early 2000 Khan was seriously injured during a raid of the local MQM-H office. MQM-A then began targeting his family and firing shots

---

[3] (...continued)
personal statement. In the latter, after recounting his kidnapping in 1999 (an event we will describe momentarily), Khan says, "I continued my work as a member of Haqiqi for the cause of Mohajir's rights despite what happened to me." And when relating another attack in 2000, he begins with, "I was busy doing my work in the office with my fellow party members." There may not be any inconsistency—by "work" Khan may have meant attending meetings or going along to the office when asked. There may also be a language or translation problem; Khan had a friend draft his personal statement for him. In any event, neither the IJ nor the BIA discussed the discrepancy or made any specific finding as to the scope of Khan's work after 1997.

at his house. "My life became miserable, … my house was attacked several times[,] and my family members were threatened." "I was forced to run from one place to another to save my life. As they looked for me, I could not go to my house, attend school or even go to mosque for prayers. I was forced into hiding for fear of my life and was literally cut off from the society, my family and all the near and dear ones."

Khan fled Pakistan briefly in 2000, spending a few months in London and a few more in the United States. He returned to Karachi in January 2001 to attend to his sick mother and to keep his job at an airline. He stayed at his uncle's house to remain hidden, only visiting his family secretly at night. Even so, MQM-H found out that he had returned. As a result he "had to attend two or three more meetings, because … they have a hold over that entire area, and I had no other option." This may have alerted MQM-A to his return; in any event, they too caught up with him.

As he was walking home one night with his brother and father, three MQM-A henchmen pulled up in a taxi and jumped out. They grabbed Khan by the hair, put a gun to his head, and threw him into the taxi. His brother and father screamed for help, but to no avail. Khan was blindfolded and taken to a room where he was beaten for two days. His captors bashed his head into the walls and told him never to associate with MQM-H and to leave the area. He was released when his father paid a 200,000 rupee ransom (approximately $3,400). Khan had only been back for a month.

After recovering from his injuries, Khan fled again, this time directly to the United States on a temporary visa. He

hoped to return to Pakistan once the situation improved, but from Khan's perspective it deteriorated; Musharraf won the general election in 2002 and remained in power. MQM-H supporters continued to be captured, tortured, and killed, so Khan decided to seek asylum.

In September of 2002, the United States initiated a program that required thousands of men from mostly Islamic countries to register with immigration services by being fingerprinted, photographed, and interrogated. *See* Cam Simpson & Flynn McRoberts, *U.S. Ends Muslim Registry*, CHI. TRIBUNE, Dec. 2, 2003, http://www.chicagotribune.com/news/watchdog/chi-0312020136dec02,0,134285.story. Fearing that he would be deported to Pakistan and killed, Khan moved to Canada in early 2003, a couple of months before the registration deadline for Pakistanis. He sought asylum there instead, but then withdrew his application when he went back to Pakistan to be with his mother, who had fallen ill again. Six months later he returned to the United States on a visitor visa and has been here ever since.

Khan's visa expired in February of 2004, so the following August he applied for asylum. (He claimed that MQM-A was still searching for him. While Khan was in Canada, some MQM-A members went to his family's house, looted it, and killed the family dog.) Khan's application alerted the government to his expired visa, so he was served with a notice to appear. He conceded his removability but also requested asylum, withholding of removal under 8 U.S.C. § 1231(b)(3)(A), and withholding or deferral of removal under the United Nations Convention Against Torture, *see* 8 C.F.R. § 208.16(c).

The case was delayed several years for a variety of reasons, one of which was that Khan's father, a witness in his case, had to return to Pakistan to free Khan's cousin who had been kidnapped and tortured by Afghan terrorists. In 2008 Khan married a United States citizen, so he also sought adjustment of status via marriage.

The government opposed Khan's requests for relief from removal, arguing that he was inadmissible for having provided material support to a terrorist organization.

On December 8, 2010, a final hearing was held on Khan's requests for relief, and in early 2011 they were denied. The IJ found that Khan had given material support to MQM-H, barring any form of relief except for deferral of removal under the Convention Against Torture. The judge denied that protection because Khan did not claim he would be tortured by the Pakistani government, but only by MQM members. The BIA affirmed, adopting and supplementing the IJ's opinion. (Confusingly, the Board refers to Khan's support of both MQM-A and MQM-H, even though the IJ had relied exclusively on Khan's participation in MQM-H.) Khan petitioned this court for review. While his petition was pending, he also filed a motion to reconsider, which the BIA denied, and he filed a separate petition from that order. Having already heard oral argument on the first petition, we consolidated the cases for decision and concluded that oral argument was unnecessary for the second. *See* FED. R. APP. P. 34(a)(2)(C).

**II. Discussion**

We have jurisdiction to review final orders of removal under 8 U.S.C. § 1252(a). "Where the Board has adopted the decision of the immigration judge and added its own reasoning, we review both decisions." *Ruiz-Cabrera v. Holder*, 748 F.3d 754, 757 (7th Cir. 2014). Our review of factual findings is governed by the deferential substantial-evidence standard, under which the BIA's decision "must be upheld if supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Weiping Chen v. Holder*, 744 F.3d 527, 532 (7th Cir. 2014) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)[4]); *FH-T v. Holder*, 723 F.3d 833, 838 (7th Cir. 2013). We will overturn "only if the record compels a contrary result." *Ruiz-Cabrera*, 748 F.3d at 757; 8 U.S.C. § 1252(b)(4)(B). "Legal [issues] are reviewed *de novo*, with deference to the agency if the issue involves an ambiguous section of the [immigration statutes] or an interpretation of agency

---

[4] *Elias-Zacarias* itself was quoting 8 U.S.C. § 1105a(a)(4), which was subsequently repealed and replaced with 8 U.S.C. § 1252(b)(4)(B). Although the standard there sounds even more deferential—"administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary"—every circuit court considering the statutory change has held that the standard did not change. *See Sou v. Gonzales*, 450 F.3d 1, 6 n.12 (1st Cir. 2006); *Xiao Ji Chen v. Gonzales*, 434 F.3d 144, 157 (2d Cir. 2006); *Dia v. Ashcroft*, 353 F.3d 228, 247–48 & nn.17–18 (3d Cir. 2003) (en banc); *Akhtar v. Gonzales*, 406 F.3d 399, 404 (6th Cir. 2005); *Menendez-Donis v. Ashcroft*, 360 F.3d 915, 917–19 (8th Cir. 2004). We too have treated them as the same, though without much discussion. *See Weiping Chen v. Holder*, 744 F.3d 527, 532 (7th Cir. 2014) (quoting both *Elias-Zacarias* and § 1252(b)(4)(B)).

regulations." *Cruz-Moyaho v. Holder*, 703 F.3d 991, 997 (7th Cir. 2012) (internal quotation marks omitted).

We also have jurisdiction to review the BIA's denial of Khan's motion to reconsider, *see Kucana v. Holder*, 558 U.S. 233 (2010), but our standard of review is even more deferential. "Motions to reconsider ask the BIA to reexamine its earlier decision in light of additional legal arguments, a change of law, or an argument that was overlooked," *Mungongo v. Gonzales*, 479 F.3d 531, 534 (7th Cir. 2007) (internal quotation marks omitted), often "rehash[ing] arguments that should have been presented the first time around," *Patel v. Ashcroft*, 378 F.3d 610, 612 (7th Cir 2004). "Yet motions to reconsider … are not replays of the main event." *Rehman v. Gonzales*, 441 F.3d 506, 508 (7th Cir. 2006). We review only for abuse of discretion and will uphold the BIA's decision unless it "was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination against a particular race or group." *Victor v. Holder*, 616 F.3d 705, 708 (7th Cir. 2010) (internal quotation marks omitted).

\*   \*   \*

Khan's primary argument is that he was never given an opportunity to prove that he didn't know MQM-H was a terrorist organization. He received a hearing, of course, but he believes he should have gotten *two*. He claims that the hearing had to be bifurcated—the IJ first needed to find that he gave material support to a terrorist organization and then conduct a second hearing on the knowledge exception.

There are two problems with this argument and both are fatal to it. First, Khan failed to raise it in his appeal to the Board. *FH-T*, 723 F.3d at 841 ("[A]n alien must exhaust all administrative remedies available to the alien as of right, … and this includes the obligation first to present to the Board any arguments that lie within its power to address." (internal quotation marks omitted)). Khan responds that the exhaustion requirement is not a jurisdictional rule, and that's true, *see id.*, but it still "limits the arguments available to an alien," *id.* (quoting *Issaq v. Holder*, 617 F.3d 962, 968 (7th Cir. 2010)). The exhaustion requirement exists to "provid[e] the Board an opportunity to apply its specialized knowledge and experience to the matter, which provides us with reasoning to review." *Minghai Tian v. Holder*, 745 F.3d 822, 826 (7th Cir. 2014) (internal quotation marks omitted).

Second, Khan doesn't have any legal authority for a right to a bifurcated hearing. His only citation is to *American Academy of Religion v. Napolitano*, 573 F.3d 115 (2d Cir. 2009), but that case is not helpful to him. There the government denied a visa to an Islamic scholar based on the material support bar. *American Academy* involved a challenge to that denial, the details of which are somewhat complicated and ultimately irrelevant here. The bottom line is that the Second Circuit remanded the case because there was nothing in the record indicating that the applicant was given "a meaningful opportunity to negate knowledge." *Id.* at 132. Khan emphasizes the following passage:

> The existence of the opportunity for the visa applicant to prove that he lacked actual or

> constructive knowledge that the recipient of his funds was a terrorist organization implies that, before a decision on the visa application is made, the alien must be confronted with the allegation that he knew he had supported a terrorist organization. Otherwise, he has no way of understanding what it is that he must show he did not know or should not have known.

*Id.* at 131–32. But this passage does not support Khan's position because Khan *was* presented with "the allegation that he knew he had supported a terrorist organization." The government made clear long before Khan's final hearing on December 8, 2010, that it recommended his removal based on his participation in MQM. As Khan acknowledges, the government took this position as early as 2008. The parties also discussed the terrorism bar during a status conference on September 13, giving Khan ample warning before he actually had to present evidence on December 8.

Furthermore, Khan's lawyer was warned that there would only be one evidentiary hearing. At the September 13 conference, he insisted that any evidentiary hearing should be bifurcated, but the IJ disagreed. If that wasn't enough, the IJ reiterated during the final hearing that it was the whole shebang: "[Judge]: I'm not bifurcating, counsel. I mean, we're going for everything. [Khan's lawyer]: Yeah, I understand that, Judge." Khan's argument that he never had a chance to contest his knowledge is meritless.

In his petition for review of the denial of his motion to reconsider, Khan makes a slightly different argument about the

adequacy of his hearing. He argues that the IJ signaled that the December 8 hearing would be limited to Khan's admissibility vis-à-vis the terrorism bar, so he was not prepared—and thus did not have an opportunity—to present evidence on his many claims for relief (asylum, withholding of removal, etc.). The record is not entirely clear in this regard, but it does not matter. Khan concedes that the terrorism bar, if it applies, blocks all of his requested forms of relief except for deferral under the Convention Against Torture (which we'll discuss momentarily). And the government had provisionally approved Khan's I-130 application for adjustment of status through marriage, so if the terrorism bar did not apply, his other requested forms of relief were irrelevant. The IJ, the government, and Khan's counsel all agreed on these points at the September 13 conference, so the evidentiary hearing on December 8 was understandably focused on the terrorism bar. Even if Khan's counsel was given the impression that the hearing was confined to this topic, there is no error because addressing most of his other arguments for relief would have been a waste of time.

That still leaves deferral, the only other topic for which evidence would have been logically relevant. But the IJ reminded Khan's counsel on both September 13 and December 8 that he needed to make a case for that relief. Khan's lawyer responded specifically that he "would rest with the [deferral] claim on the record" and "would not ask any questions … other than resting with the application itself." Therefore, we reject Khan's arguments that his hearing was somehow inadequate.

Most of his remaining arguments can be disposed of fairly quickly. First, Khan argues that *none* of the ways in which he supported MQM-A or MQM-H were "material." The statute says that "material support" includes "a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training." § 1182(a)(3)(B)(iv)(VI). Khan didn't provide any of these things, but the list is not exhaustive, *see id.* ("an act that … affords material support, *including* a safe house … " (emphasis added)); *Singh-Kaur v. Ashcroft*, 385 F.3d 293, 298–99 (3d Cir. 2004), and as the IJ noted, Khan "distributed flyers, posted signs, looked after the local office, and recruited individuals in his neighborhood to attend the organization's meeting"—and he did so for multiple years. Recruiting by itself meets the statutory definition of "engaging in terrorist activity," § 1182(a)(3)(B)(iv)(V)(cc), so surely years of recruiting also counts as material support, *see also Hussain*, 518 F.3d at 538 (upholding a removal order based on § 1182(a)(3)(B) where an individual had "recruited for MQM-H and solicited funds for it as well"). Courts have found less significant support to be sufficiently material. *See, e.g., Singh-Kaur*, 385 F.3d at 298–99 (providing food and setting up shelter); *In re S-K-*, 23 I. & N. Dec. 936, 945 & n.13 (B.I.A. 2006) ($685 in donations).

Khan also argues that his participation was immaterial because it only related to the groups' peaceful political activities, but we rejected this argument in *Hussain*. 518 F.3d at 538 ("If you provide material support to a terrorist organization, you are engaged in terrorist activity even if your support is

confined to the nonterrorist activities of the organization."). We find no error in the BIA's conclusion that Khan provided material support to MQM-A and MQM-H.

Khan's next contention is that he was improperly denied deferral of removal under the Convention Against Torture, the only relief not precluded by the terrorism bar. So-called "CAT deferral" requires evidence that the alien will be tortured *by the government* or with its acquiescence. 8 C.F.R. §§ 1208.16(c)(3), 1208.17(a), 1208.18(a)(1); *e.g.*, *Bitsin v. Holder*, 719 F.3d 619, 630–31 (7th Cir. 2013); *Ishitiaq v. Holder*, 578 F.3d 712, 718 n.3 (7th Cir. 2009); *Pavlyk v. Gonzales*, 469 F.3d 1082, 1090 (7th Cir. 2006). But Khan's lawyer essentially conceded that Khan was not in danger of torture by the Pakistani government. When the IJ reminded him that he needed to present a case for deferral, he responded: "We've never alleged that the government of Pakistan has tortured the respondent, kidnapped him, or done any harm to him whatsoever. It's a group that the government would be unable to control."

Khan asserts that the IJ and the BIA failed to consider several reports about conditions in Pakistan. The IJ, however, explicitly mentioned these reports in the list of exhibits he considered, and the BIA adopted his decision. Furthermore, the reports that Khan identifies contain only a few oblique and summary references to the government's ability to control violent clashes between the MQM groups—saying, for example, that "[t]he Pakistani state is often either unable or unwilling to protect its citizens from the violent MQM factions." That is not enough to establish that Khan is likely to be tortured by

or with the acquiescence of the Pakistani government. We see no error here either.

Khan also spends three sentences in his second petition arguing that the IJ should have indefinitely continued his proceedings while he sought a waiver under 8 U.S.C. § 1182(d)(3)(B) (allowing the Secretary of State or the Secretary of Homeland Security to grant a waiver of the terrorism bar in certain circumstances). To the extent that this can be characterized as a developed argument, it is foreclosed by *FH-T*. 723 F.3d at 847–48.

That brings us to Khan's final argument, his best one. In his petition for review of the BIA's denial of his motion to reconsider, Khan argues that the immigration agency erred by assuming that "knowledge of kidnapping and violence [is] *per se* sufficient to preclude an individual from invoking the [knowledge] exception." There may be something to this argument. Though we ultimately can't reach it, it's worth pointing out the problem.

An entire organization does not automatically become a terrorist organization just because some members of the group commit terrorist acts. The question is one of authorization. We made this point in *Hussain*. 518 F.3d at 538 ("An organization is not a terrorist organization just because one of its members commits an act of armed violence without direct or indirect authorization, even if his objective was to advance the organization's goals."). But if an organization does not *become* a terrorist organization until it authorizes terrorist acts, then a person may not *know* whether he is supporting a terrorist organization until he knows which acts are authorized. Even

if someone is aware of violent acts by some members of his group, that does not necessarily mean that he knew or should have known that the acts were backed by the leaders. This is especially so in diffuse political parties in poor countries. And even if an organization actually does sanction terrorist acts, that does not automatically mean that all of its members will be aware that authorization has been given. A leader in an otherwise peaceable group might secretly authorize some branch to commit atrocities but leave the majority of its members oblivious.

The IJ and BIA seem to have assumed that Khan's awareness of some violence by members of the MQM factions automatically precluded him from showing that he didn't know he was supporting a terrorist organization. Both relied almost exclusively on Khan's own testimony to rule out the knowledge exception. But we are unable to find anything in Khan's testimony that clearly indicates that he was aware of *group-sanctioned* violence for any significant period of time during his involvement. If anything, his testimony shows the opposite. After all, Khan left MQM precisely because of its violence. Twice. The government's position is that he did not leave soon enough, but this means that the timing of Khan's awareness and withdrawal from involvement becomes critical. Although the IJ and BIA agreed with the government's position, neither made any specific findings on this more nuanced point.

With respect to Khan's time with MQM-A—which, recall, only the BIA discussed, and even then it's not clear how this affected the knowledge exception—the agency wrote:

> [Khan] acknowledged that he knew [MQM-A]
> began to commit acts of torture, killing, kidnap-
> ping, and rape during the time he was a member
> of that organization, and that such acts were
> reported in the media. (Exh. 5, Tab A, at 6–7;
> Tr. at 242–43). These actions constitute terrorist
> activity. … [Khan's] objection to such conduct is
> the reason he decided to join the MQM-H when
> the factions split.

In his personal statement (this is the Exhibit 5 referenced by the BIA), Khan does explain that the leadership of MQM-A turned the party toward "killings, tortures, harassments, kidnappings for ransom money, rapes, … and all sorts of criminal activities." But this statement must be understood in context: Kahn was explaining why he *left* the group. He also explains that "[t]he involvement of [MQM-A] in criminal activities mentioned earlier came as a shock/surprise to Mohajirs and their supporters, including me." And later: "Because I … was fed up with the criminal attitude and policies of [MQM-A], I … decided to leave the party." Khan's testimony on the stand was consistent. Nothing he said establishes any significant overlap between Khan's awareness that MQM-A authorized terrorist activities and his involvement with the group. That may explain why the IJ limited his findings to Khan's time with MQM-H.

With respect to Khan's involvement with MQM-H and the timing of his awareness that it too had become violent, the IJ wrote: "[Khan] testified that he 'gradually' became aware that the MQM-H was engaging in violent acts but continued to

support it for several years. As such, he has not met his burden to show that he falls within the exception." The BIA was similarly nonspecific on this point: "Even [after Khan left MQM-A for MQM-H], however, [he] concedes he was aware of killings being perpetrated by both factions." The IJ didn't cite to the record, but his finding that Khan "gradually" became aware of violence may have come from the following exchange:

> [Government]: So, sir, if I understand you correctly, then you knew that MQM-H was also perpetrating violence, is that correct?

> [Khan]: In the beginning they were doing good things, but later on, gradually, they started doing the same things as [MQM-A].

But this question and answer was immediately preceded by Khan's specific testimony that he curtailed his involvement as soon as he fully appreciated the scope of the violence:

> [Government]: And you were aware of this ongoing violence between these two groups, is that correct?

> [Khan]: As soon as I came to know that these both groups are getting violent, and when they were clashing, I stopped working for them, and I stopped attending their meetings and kept myself aloof from them.

A few questions later, the government even asked explicitly about the timing of his involvement and awareness:

> [Government]: Okay, so, did you still work for them and participate with the MQM-H even after you were aware of the fighting between [MQM-A] and MQM-H?
>
> [Khan]: I used to [express my support for] them, but I never … worked for them or inter-fered with their work or what they were doing.

Khan further clarified that in addition to expressing support for MQM-H when asked, he also attended meetings when MQM-H members called on him. This more limited involve-ment lasted for another three or four years and may have been the basis of the IJ's finding that he "continued to support [MQM-H] for several years," even after recognizing its violence.

The government relies on Khan's attendance at meetings to support its argument that he didn't leave MQM-H soon enough. Of course, Khan also testified that he "had to attend" because "they have a hold over that entire area, and I had no other option," and it's an open question whether there is a duress exception to the material support bar. *See Ay v. Holder*, 743 F.3d 317, 320–21 (2d Cir. 2014). It's doubtful that attending meetings, without more, constitutes "material support" for a terrorist organization. Khan obviously can't argue that he didn't provide *any* material support to MQM at *any* time, but his involvement might be characterized as "immaterial" after he realized that the group condoned violence.[5]

---

[5] That is, unless Khan continued his more significant work for MQM-H

(continued...)

The IJ also found that Khan *should have known* that MQM-H was a terrorist organization even if he didn't. But this finding also seems to rest on the assumption that mere knowledge of violence by members of an organization is enough: "The evidence in the record shows that the MQM-H committed violent political acts in 1994 and 1995, the years during which [Khan] claims he was most active in the party." The government defends this finding by pointing to *Hussain*, where we said that MQM-H's violent acts "were so frequent that Hussain could not have failed to learn about them," and that "an inference that [the violence] was authorized is inescapable." 518 F.3d at 539. The same is true of Khan, the government argues, because he "lived in the same city at the same time and was a member of the same organization." True, Khan must have been aware of violence by members of MQM-H—and he admits that he was—but he may not have recognized that it was a group-sanctioned phenomenon.

And there is an important difference between Hussain and Khan: Hussain was a "high-level official of the organization, in charge of a region in which there were 100,000 Mohajirs, of whom 2,000 belonged to his organization and thus were under his command," *id.*, while Khan "distributed flyers … and sometimes … looked after the local office." Hussain could not plausibly argue that he was unaware of what MQM-H was authorizing because he was in charge. Khan, on the other hand, was about as low as one could be in the organization. At the

---

[5] (...continued)

even after 1997, as his personal statement may imply. *See supra* note 3. But the immigration courts would need to make a finding on this to rely on it.

time Khan was involved with MQM, Karachi had a population equivalent to that of New York City today, covered a much larger area, and was far less developed, *see Demographics of Karachi*, WIKIPEDIA, http://en.wikipedia.org/wiki/Demographics_of_Karachi (last visited Sept. 4, 2014); *Karachi*, WIKIPEDIA, http://en.wikipedia.org/wiki/Karachi (last visited Sept. 4, 2014)—so it's plausible that Khan's awareness was limited by the events occurring in his immediate vicinity. And recall that by at least one historian's account, MQM-H leaders were running a campaign to convince low-level members that MQM-A was the terrorist faction of the movement. *See* Farhat Haq, *supra*, at 1001. It's hardly surprising that they could convince a teenager.

In the end, however, we can't resolve the more precise knowledge question because Khan failed to exhaust the argument before the Board. *See FH-T*, 723 F.3d at 841. Khan's brief suggests that he raised this issue in the following two sentences in his motion to reconsider: "The Board concluded that the respondent provided 'material support' only by the respondent acknowledging 'he knew the MQM began to commit acts of torture, killing, and rape during the time he was a member.' This finding by the Board does not accurately depict the respondent's testimony." These two short sentences do not clearly articulate the argument now raised on review; they were certainly not enough to notify the BIA of the embedded legal issue about the proper interpretation of the knowledge exception. Nor did Khan make the argument in his initial appeal to the BIA. Khan's lawyer did argue that Khan's testimony "shows that [he] did not reasonably know that the organization was a terrorist organization." But the theory

advanced was that Khan couldn't possibly have known that MQM-H was a terrorist organization because his involvement preceded the enactment of the statutory section defining Tier 3 terrorist organizations. The Board rejected that argument, and Khan does not repeat it here.

The exhaustion requirement is not just an empty formality; it exists in part to prevent error by appellate courts. We've identified the more nuanced knowledge question here in order to flag it for future cases, but we might have missed something. In any event, the issue should be addressed by the BIA in the first instance. Had Khan made this argument to the Board, it could have "appl[ied] its specialized knowledge and experience to the matter." *Id.* (internal quotation marks omitted). On the present record, labeling Khan a terrorist to prevent him from remaining in the United States with his American citizen wife is troubling, but we cannot ignore the exhaustion requirement, especially not for an argument raised for the first time on a petition for review from a motion to reconsider, where our deference to the BIA is at its peak.

For the foregoing reasons, we DENY the petitions for review.