NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued March 2, 2016
Decided April 4, 2016

**Before**

DIANE P. WOOD, *Chief Judge*

WILLIAM J. BAUER, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

No. 15-2464

| | |
|---|---|
| PETAR BORISOV YUSEV and KATERINA GEORGIEVA YUSEVA, *Petitioners*, | Petitions for Review of an Order of the Board of Immigration Appeals. |
| *v.* | Nos. A089-070-635 & A089-070-636 |
| LORETTA E. LYNCH, Attorney General of the United States, *Respondent*. | |

**ORDER**

An immigration judge denied an application for asylum and withholding of removal from Petar Borisov Yusev and Katerina Georgieva Yuseva, a married couple from Bulgaria. The Board of Immigration Appeals upheld that decision. Rather than petition this court for review, Yusev and Yuseva asked the Board to reconsider its decision. Their motion, which did not identify a legal or factual error in the Board's decision, was denied, prompting the case now before us. Essentially, the petitioners are trying to work around their failure to seek review of the Board's initial decision, which

they cannot do. And as far as their motion to reconsider, the Board did not abuse its discretion in denying it.

The petitioners had entered the United States with visitor's visas in January 2005 and overstayed. Petar and, derivatively, Katerina applied for asylum and withholding of removal in 2007, the same year that Bulgaria entered the European Union. In their application the couple claimed that they had been persecuted because of their Macedonian ethnicity and membership in OMO Ilinden. That organization, which advocates for the rights of ethnic Macedonians, was registered as a political party in 1998 but two years later declared illegal by the Bulgarian Constitutional Court because the country's constitution prohibits political parties formed along ethnic lines. The petitioners said they fear reprisal by Bulgarian authorities because they had been active in OMO Ilinden after joining in 2000. The couple was running a restaurant, and when they began hosting the organization's leaders for meetings, the police came by warning that they should drop out of the "separatist organization" if they did not want trouble for the restaurant or their family. On one occasion, Petar said, a police officer had punched him in the stomach. The worst incident, the couple said, was in 2004 during a peaceful cultural commemoration when police officers restrained them, slapped Katerina, choked Petar, and confiscated their identification cards. The officers had said that they knew where to find the petitioners and would "deal with" them later.

The petitioners further asserted in their application that they had entered the United States not intending to stay but changed their minds after learning from their adult sons in Bulgaria that authorities were looking for the couple. The petitioners explained that they had not sought visas for their two sons because they were young and not political and thus "safe" (an explanation that directly contradicts the petitioners' assertion that they came to this country only to visit). But then in 2006 (long after the petitioners' visas had expired, we note) the police had gone looking for them at their home and were told by their sons that the couple was traveling within Bulgaria. The sons withheld this information from their parents, however, until after a second incident in 2007 when police confronted one of the sons, saying that they knew the couple was in the United States and that the sons should be arrested and beaten for lying. These events, the petitioners said, made them fear being tortured or killed if they returned to Bulgaria, and prompted them to apply for asylum and withholding of removal in June 2007.

Roughly six years later, at a hearing before an IJ in July 2013, Petar expressed his belief that the situation in Bulgaria had deteriorated. He testified that Macedonians still are not recognized as an ethnicity by the Bulgarian government, and that, because of his ethnicity and political activity, he could be killed or, if he got sick, would be unable to

obtain medical treatment at a hospital. Katerina (who was then 54, four years younger than Petar) testified that she remembered not being allowed to listen to Macedonian radio as a child, and that her mother's passport had been burned because it identified her ethnicity as "Macedonian." Both Katerina and Petar conceded that they had never been arrested for their political beliefs.

The last witness at the hearing was Anguel Passov, a friend of the petitioners and an ethnic Macedonian from Bulgaria who was granted asylum in 1998. Passov testified that he also had become a member of OMO Ilinden in Bulgaria, though he did not meet the petitioners until 2005 in the United States, and that he continued to be active in the organization. Passov said he had started making yearly visits to Bulgaria in 2007 and nearly every time had been summoned to a police station. Passov was asked if he had met any of Petar's relatives, and he responded that he had met the petitioners' son Boris[1] and discussed with him "the situation of the Macedonians in Bulgaria, and that they were still looking" for Petar. Passov then was asked when he had met with Boris, and he replied, "Almost every time when I went back, but the first time was in 2007."

The petitioners also submitted documents describing the history and treatment of ethnic Macedonians in Bulgaria. A 2009 report from Amnesty International mentions that in May of that year representatives of OMO Ilinden had alleged that police officers continue to interrogate supporters about the organization. That report and a U.S. Department of State report of the same year further explain that the Bulgarian government still had not allowed the organization to register as a political party, despite a 2005 ruling by the European Court of Human Rights that nonrecognition violates the European Convention on Human Rights and ignores demands from the European Union. In contrast, a 2012 Country Report from the State Department,

---

[1] At the removal hearing in 2013, Petar testified that his second son, Georgi, came to the United States in 2008 and was living with the petitioners. Georgi did come to this country in 2008—that much is true. But at the time of the hearing, he apparently was in the custody of the Marshals Service awaiting a hearing on an extradition request from the Bulgarian government. *See In Re Yusev*, No. 12 M 727, 2013 WL 1283822 (N.D. Ill. March 27, 2013). Georgi had been charged by Bulgarian authorities with drug possession, unlawful damage to motor vehicles, and inflicting minor bodily injury to intelligence officers but evaded prosecution by using a phony passport to obtain a visitor's visa and fleeing to the United States in December 2008. About four years later Georgi was convicted of visa fraud and sentenced to 6 months' imprisonment. *United States v. Yusev*, 12 CR 230 (N.D. Ill. Nov. 27, 2012). Afterward he was remanded to the custody of immigration authorities pending removal proceedings, *In Re Yusev*, No. 12 M 727, 2013 WL 5979678, at *1 (N.D. Ill. Oct. 29, 2013), but then in January 2013 he was arrested and detained on the Bulgarian government's extradition request. In October of that year, a magistrate judge concluded that Georgi was extraditable. *Id.* at *5.

although acknowledging that the Bulgarian constitution forbids establishing political parties along ethnic lines, observes that "in practice this prohibition did not appear to weaken the role of some ethnic minorities in the political process, and a number of parties represented various ethnic minority groups." These reports also describe instances of police abuse and mistreatment of minorities, but do not discuss police harassment of Macedonians in particular.

In denying all relief the IJ first explained that the petitioners had not filed their application within a year of arriving in the United States, as is required for asylum, *see* 8 U.S.C. § 1158(a)(2)(B). The IJ then rejected the couple's argument that the information they had received in 2007 about police visiting their sons constituted a "changed circumstance" that would excuse the untimeliness, reasoning that the couple's alleged fear of returning to Bulgaria rests largely on incidents occurring before they left. As for withholding of removal, the IJ was persuaded by the documentary evidence that the Bulgarian government refuses to recognize Macedonians as a distinct ethnicity and that citizens who identify as ethnic Macedonians sometimes were subjected to discrimination, police harassment, and intimidation. But, the IJ continued, the personal experiences described by the petitioners "fall far short of establishing past persecution." The petitioners had never been arrested, detained, or seriously physically abused, the IJ explained, and their son who still lives in Bulgaria had not been harmed or forced to close the family restaurant.

The Board, acting through a single member, upheld the IJ's decision. The Board agreed with the IJ that no changed circumstance excused missing the one-year deadline for seeking asylum. And, the Board continued, the IJ properly had concluded that what the petitioners experienced in Bulgaria did not amount to past persecution.

Rather than petition for review of that decision, the couple filed a motion with the Board a month later asking for reconsideration. They argued that, under 8 C.F.R. § 1003.1(e)(6), the Board should have convened a three-member panel to decide their appeal. And, the couple contended, the Board had erred in rejecting their claims of past persecution, and the likelihood of future persecution in Bulgaria. The Board denied the motion, concluding that the couple had not identified any material error of law or fact in its underlying decision. The Board added that the couple's appeal from the IJ's decision did not fall within any category in 8 C.F.R. § 1003.1(e)(6) requiring three-member review, and that the rest of their arguments in the motion for reconsideration essentially repeated what they had said in their brief in that appeal.

Because Petar and Katerina petitioned for review more than 30 days after the Board had upheld the IJ's denial of asylum and withholding, we have jurisdiction to

review only the denial of the petitioners' motion to reconsider, not the Board's initial decision or the IJ's underlying order of removal. *See* 8 U.S.C. § 1252(b)(1); *Stone v. INS*, 514 U.S. 386, 405–06 (1995); *He v. Holder*, 781 F.3d 880, 882 (7th Cir. 2015). This court reviews a denial of a motion to reconsider only for abuse of discretion. *Khan v. Holder*, 766 F.3d 689, 696 (7th Cir. 2014). Motions to reconsider "are not replays of the main event" and must point the Board to additional legal arguments, a change of law, or an argument that was overlooked in its earlier decision. *Id.*; *see* 8 C.F.R. § 1003.2(b)(1); *Cruz-Moyaho v. Holder*, 703 F.3d 991, 998 (7th Cir. 2012). The Board abuses its discretion if its decision to deny a motion to reconsider "was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination against a particular race or group." *Khan*, 766 F.3d at 696 (quotation marks and citation omitted).

The petitioners first argue that their motion for reconsideration should have been granted because, they say, the motion identifies a "material error of fact" in the Board's initial decision. The Board, in accepting the IJ's conclusion that the petitioners are unlikely to face persecution if they return to Bulgaria, had said that there was "no evidence that the police continue to look" for Petar, "much less that they seek to harm him." The petitioners suggest that this statement is contradicted by the testimony of their friend Passov, but they not only misrepresent the Board's statement but also exaggerate the significance of Passov's testimony. The Board acknowledged in its initial decision (as had the IJ) that twice, *in 2006 and 2007*, police went looking for the petitioners at their home or restaurant, but the Board also noted that "the last inquiry was more than 7 years ago." This passage of time is the basis for the Board's statement—in the very same sentence—that there wasn't evidence "that the police continue to look" for Petar. And Passov's testimony is not contradictory; Passov said that he had met with one of the petitioners' sons on multiple occasions, but he did not say that he was told of further visits by the police after 2007. This vague testimony does not create the type of mistake of fact that is appropriately challenged in a motion to reconsider as opposed to a petition for review. *Compare Victor v. Holder*, 616 F.3d 705, 706–09 (7th Cir. 2010) (rejecting, as inappropriate for motion to reconsider, Christian petitioner's argument that Board and IJ had mischaracterized as "mere harassment" Muslim cleric's threat to call Pakistani police and falsely accuse petitioner of blasphemy), *with Dawoud v. Gonzales*, 424 F.3d 608, 611 (7th Cir. 2005) (explaining that Board's factual finding was "flatly contradicted" by country reports and concluding mistake was "rare case" in which Board abused discretion in denying motion to reconsider).

The petitioners' remaining challenges to the Board's reasoning are similarly flawed. Essentially they try to turn the current proceeding into an untimely petition for review of the Board's initial decision by arguing that the Board and the IJ should have excused their untimely asylum application on the basis of "changed circumstances," misapplied the law in determining that they had not shown past persecution, and incorrectly "weighed" the evidence concerning the possibility of future persecution. These are not the types of errors that can properly be argued in a motion for reconsideration, *see Victor*, 616 F.3d at 709, and the Board did not abuse its discretion in refusing to consider them.

Finally, the petitioners argue that the Board should have referred their appeal to a three-member panel rather than allowing it to be decided by a single member. The regulations give Board members discretion to refer an appeal to a three-member panel in six different circumstances, but referral is not *required.* 8 C.F.R. § 1003.1(e)(6); *Ward v. Holder*, 632 F.3d 395, 398–99 (7th Cir. 2011). And, regardless, the petitioners have not demonstrated that their case falls into any of the six categories. The couple contends that their appeal to the Board involved "a need to review a decision by" an IJ "that is not in conformity with the law or with applicable precedents," *see* 8 C.F.R. § 1003.1(e)(6)(iii), and the need to reverse an IJ's decision for a reason other than an intervening act of Congress or an intervening final regulation, *id*. § 1003.1(e)(5), (e)(6)(vi). But the petitioners did not show that the IJ's decision was "not in conformity with the law."

Accordingly, we DENY the petitions for review.