**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-1056
_____

JOSHIM UDDIN,

Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA,

Respondent

_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(Agency No.:  A208-059-346)
Immigration Judge:  Honorable Alan Vomacka

_____

Argued July 13, 2017

Before: GREENAWAY, JR., SHWARTZ, and RENDELL,
Circuit Judges

(Opinion filed: September 6, 2017)


Visuvanathan Rudrakumaran, Esquire **(Argued)**
Law Office of Visuvanathan Rudrakumaran
875 Avenue of the Americas
Suite 906
New York, NY   10001

                                  Counsel for Petitioner

Daniel I. Smulow **(Argued)**
United States Department of Justice
Office of Immigration Litigation
P. O. Box 878
Ben Franklin Station
Washington, DE   20044

                                  Counsel for Respondent


O P I N I O N

**RENDELL**, <u>Circuit Judge</u>:

The Board of Immigration Appeals ("Board") found that Joshim Uddin, a citizen and native of Bangladesh, was ineligible for withholding of removal because he was a member of the Bangladesh National Party ("BNP"), a major political party in his homeland. According to the Board, the BNP qualified as a Tier III terrorist organization under the Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1182(a)(3)(B)(vi)(III). Thus, Uddin's membership in the BNP rendered him ineligible for relief.

While we will deny the petition for review challenging the Board's ruling dismissing Uddin's Convention Against Torture ("CAT") claim, we will grant the petition in part and remand on his withholding of removal claim. The Board has pointed to terrorist acts by BNP members. But it did not find that BNP leadership authorized any of the terrorist activity committed by party members. Today, we join the reasoning of the Seventh Circuit and the Board in many of its own opinions by holding as follows: unless the agency finds that party leaders authorized terrorist activity committed by its members, an entity such as the BNP cannot be deemed a Tier III terrorist organization.

### I. Statutory Background

The so-called "terrorism bar" precludes aliens who are members of "terrorist organizations" from seeking several

3

forms of relief, including withholding of removal. *See* 8 U.S.C. §§ 1182(a)(3)(B)(i), (vi); 1227(a)(4)(B); 1158(b)(2)(A)(v); 1231(b)(3)(B)(iv).

The INA, in turn, establishes three different kinds of terrorist organizations.

**Tier I** terrorist organizations are officially listed groups designated by the Secretary of State. 8 U.S.C. §§ 1182(a)(3)(B)(vi)(I) & 1189. Such groups are maintained on an official register, and are thus easily identifiable to immigration authorities.

**Tier II** terrorist organizations are groups that have engaged in terrorist activity, and are designated by the Secretary of State in consultation with or upon the request of the Attorney General or the Secretary of Homeland Security, for purposes of immigration exclusion. 8 U.S.C. § 1182(a)(3)(B)(vi)(II). Such groups are maintained on an official register, and are thus also easily identifiable to immigration authorities.

**Tier III** terrorist organizations, the groups at issue in this case, are groups "of two or more individuals, whether organized or not, which engage[] in, or [have] a subgroup which engages in," terrorist activity. 8 U.S.C. § 1182(a)(3)(B)(vi)(III). Terrorist activity is defined broadly by the statute as conduct "unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State)" and which involves one of several enumerated actions, including the "highjacking or sabotage of any conveyance," "an assassination," use of any

4

"biological agent, chemical agent, or nuclear weapon or device, or [ ] explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property," or a "threat, attempt, or conspiracy to" commit such acts. 8 U.S.C. § 1182(a)(3)(B)(iii).

There is no official register of Tier III organizations; instead, groups are adjudicated as Tier III organizations on a case-by-case basis.

A. *Assessing Tier III Status*

There is relatively little guidance from Courts of Appeals as to how to determine whether an organization is a Tier III terrorist group. But, from a procedural standpoint, departmental regulations set forth a burden-shifting structure for adjudicating such cases. First, the Government must introduce evidence "indicat[ing]" that a group qualifies as a Tier III terrorist organization. Then, the burden shifts to the applicant to prove "by a preponderance of the evidence" that the bar does not apply. 8 C.F.R. § 1208.16(d)(2).

If an alien is deemed a member of a Tier III organization, then he can avoid the terrorism bar if he can "demonstrate by clear and convincing evidence that [he] did not know, and should not reasonably have known, that the organization was a terrorist organization." 8 U.S.C. § 1182(a)(3)(B)(i)(VI).

**II. Factual Background**

A. *Events in Bangladesh*

The BNP, led by Khaleda Zia since 1984, is one of Bangladesh's two major political parties; the other is the Awami League (AL). Both groups have been in and out of power over the past several decades: From 2001 to 2006, the BNP was in power. From approximately 2006-2008, a military-backed government ruled the country to oversee free and fair elections. In late 2008, the AL won a decisive victory to lead the country. In January 2014, the most recent election, the AL maintained its hold on power, despite significant protests and demonstrations by the BNP as to the election's fairness.

Uddin joined the BNP in February 2008, when the group was no longer in power. Soon after, he was promoted to general secretary for his district. In this position, he distributed posters and recruited college students.

Uddin claims that on several occasions, members of the AL persecuted him on account of his political beliefs. First, he asserts that on December 1, 2008, ten members of the AL approached him while he was hanging BNP posters with colleagues. When he refused to stop hanging posters, the AL members allegedly beat him, resulting in injuries to his face that a doctor treated with stitches.

Second, he claims that in March 2009, AL members broke his leg with a hockey stick.[1] Third, Uddin asserted that AL members threatened to kill him in October 2009 if he did

---

[1] A doctor's statement, prepared in May 2016 for Uddin's immigration litigation, supports the contention that Uddin's ankle was broken with a hockey stick in 2009.

6

not stop working for the BNP, and that AL members threatened him again in November and March 2010.

Finally, Uddin alleged that on July 15, 2011, between ten and fifteen AL members broke into to his home and burned it down. Uddin had escaped through the back door. In October 2011, Uddin fled Bangladesh.

B. *Events in the United States*

After traveling through more than a half-dozen countries, Uddin entered the United States illegally in 2013. He eventually settled in Brooklyn, New York. In 2015, he attended "about one or two" meetings of BNP members in the United States. AR 155.

Later in 2015, Uddin was arrested in New Jersey for charges that were eventually dismissed in state court, including selling untaxed cigarettes and possession of marijuana, drug paraphernalia, and a weapon (brass knuckles). After he posted bail, immigration officers arrested him on January 28, 2016, and served him with a Notice to Appear charging him with removability under 8 U.S.C. § 1182(a)(6)(A)(i) (alien present in United States without having been admitted or paroled by an immigration officer).

C. *IJ Proceedings*

At his hearing before an Immigration Judge, Uddin conceded his removability as charged. But he filed a defensive application for asylum, withholding of removal, and CAT protection. Eventually he conceded, through counsel, that he was ineligible for asylum because his

7

application was untimely, and that he did not qualify for an exception to the one-year deadline set forth in 8 U.S.C. § 1158(a)(2)(B).[2] But Uddin maintained that he was eligible for withholding of removal and CAT protection. He argued that because of his affiliation with the BNP, he would face persecution if returned to Bangladesh on account of his political beliefs.

The IJ denied Uddin's application for relief.[3] He found that Uddin was ineligible for withholding of removal because he was a knowing member of a Tier III terrorist organization, the BNP. The IJ found "abundant [record] evidence from reliable sources that the BNP has used violence for political purposes in the past." AR 71.

Describing that "abundant" evidence, the IJ first quoted a Congressional Research Services report on Bangladesh saying that "[p]olitical violence has long been part of the political landscape in Bangladesh." AR 71. He further noted that Uddin's own evidence stated that former

---

[2] Uddin has not appealed the denial of his asylum claim.

[3] The IJ made a "mixed" credibility finding. He found Uddin "credible as to his support for the BNP, but *not* reliable or credible as to specific alleged events that form the basis for his claim of past persecution and fear or persecution." AR 63. The IJ observed that Uddin "testified in a manner which tends to indicate he had memorized [his] narrative." AR 62. Further, Uddin apparently misstated significant facts about political elections in Bangladesh during the time he was supposedly an active party member. The IJ also noted shortcomings in Uddin's corroborating evidence: most of it was prepared for his immigration litigation.

8

opposition parties were "quick to take revenge on their outgoing rivals . . . often in the form of violent attacks." *Id.* (emphases omitted).

Next, the IJ relied on a report stating that while in power from 2001 to 2006, the BNP "was criticized for its tacit support of radical Islamic groups," which were reportedly behind bomb blasts in 2005. AR 72. Then, the IJ cited evidence that the BNP had created the Rapid Action Battalion ("RAB") while in power, which it used as an extrajudicial "death squad" during its last term in office. AR 72.[4]

Finally, and most importantly, the IJ found evidence that BNP activists resorted to "massive violence including the torching of dozens of polling centers" during the 2013-2014 election cycle. AR 72 (citation omitted). The IJ emphasized that the BNP's leader, Khaleda Zia, had "announced the party would hold a series of general strikes and traffic blockades halting transport links to the capital."[5] AR 73. During these strikes, according to an "authoritative" report by the NGO Human Rights Watch, "opposition party workers" (i) burned a truck driver's wife and baby alive by "fail[ing] to allow enough time for [them] to escape the vehicle;" (ii) killed four

---

[4] After the BNP left power, it did not maintain control of the RAB. Currently, the AL controls the RAB.

[5] The Human Rights Watch Report attributed strike violence to "opposition activists," AR 301, rather than to the BNP specifically. But the IJ believed that there was evidence to conclude "opposition activists" meant the BNP, since the BNP was the "largest party in the opposition coalition." AR 75.

people by throwing a bomb onto a bus they were riding; (iii) badly burned a thirteen-year-old boy by torching the bus he worked on; and (iv) injured a seven-year-old's hand, legs, and abdomen by throwing a bomb in front of him. AR 73.[6] The IJ also discussed opposition supporters' "leaving homemade grenades on the streets, wrapped in colorful paper, which were picked up by children." AR 73. Opposition workers also purportedly attacked polling centers to hamper voter turnout in the 2014 election. Because the BNP "used violence for political purposes to an extent that constitutes engaging in terrorist activity," the IJ found that the party was a Tier III terrorist organization. AR 75 (emphasis omitted).

Turning to the CAT claim, the IJ found that Uddin was ineligible for relief because he "failed to establish a probability of torture, given weaknesses in his credibility and corroborating evidence." AR 77.

D. *Board Proceedings*

---

[6] Analyzing whether Uddin had proved that he did not, or should not have known, that the BNP was a terrorist organization, the IJ opined that before Uddin joined, the BNP used political violence, and created the RAB. While he was active, the party took no "known action to abandon its history of violence." AR 75. After he joined, BNP activists resorted to massive violence including torching polling centers. Based on this history, notwithstanding Uddin's sworn testimony that he did not know about BNP members' violent acts, the IJ found that Uddin "could not have joined the BNP and served as a publicity officer without being aware of [its] history [of violence]." AR 76.

Uddin appealed to the Board, which dismissed his claim. To start, the Board noted that Uddin had not "meaningfully challenged" the IJ's decision denying his request for protection under CAT. AR 3 n.1. He did not mention the IJ's denial of CAT protection in his Notice of Appeal, and made only two passing references to CAT protection in his brief to the Board. Thus, the Board "deem[ed] [the] claim waived on appeal." *Id.*

Next, the Board agreed with the IJ that Uddin was ineligible for withholding of removal as a member of a Tier III terrorist organization. The Board highlighted Uddin's admitted membership in the BNP, and his continued support for the organization even after he entered the United States.

The Board also found that the record reflected "abundant evidence" that the BNP had used violence for political purposes in the past, including its creation of the RAB which it employed as a "death squad" while in power. AR 4. It noted the "deadly results of the campaign to disrupt the Bengali election in January 2014." AR 4. The Board further emphasized that the BNP leader "publicly announced a plan to obstruct the 2014 election by strikes, boycotts, and blockades." AR. 4. And, like the IJ, the Board stated that "party officers" employed forms of violence which resulted in death and serious injury.[7] AR 4.

---

[7] The Board noted that it did not address the IJ's determination regarding credibility, because it had found that the terrorism bar applied.

11

### III. Analysis[8]

A. *CAT Claim*

Uddin urges that the Board erred in refusing to review his CAT claim. We disagree. In his Notice of Appeal, Uddin did not mention the CAT claim. And he made only passing reference to CAT twice in his brief the Board.[9] Because he provided the Board no way to identify his grievance with the IJ's CAT ruling, the Board dismissed the claim.

We review such dismissals for abuse of discretion: the Board, in its discretion, may determine "when to summarily dismiss an appeal for lack of specificity and when the BIA is sufficiently appraised of the appealable issues to entertain the appeal." *Lin v. Att'y Gen.*, 543 F.3d 114, 124 (3d Cir. 2008); 8 C.F.R. § 1003.1(d)(2)(i) (stating that the Board "may summarily dismiss any appeal or portion of any appeal . . . [that] fails to specify the reasons for the appeal . . . ."); *see also* 8 C.F.R. § 1003.3(b) (an alien "must specifically identify the findings of fact, the conclusions of law, or both that are being challenged" to avoid summary dismissal). Here, it is clear that the Board did not abuse its discretion in dismissing Uddin's undefined CAT claim: Uddin provided the Board no basis for ruling on his vague objection to the IJ's CAT denial.

---

[8] We have jurisdiction pursuant to 8 U.S.C. § 1252. The Board's jurisdiction arose under 8 C.F.R. §§ 1003.1(b)(3) & 1240.15.

[9] Uddin simply stated twice that the IJ "summarily dismissed [Uddin's] claim under the [CAT] with little to no analysis given to the claim." AR 10 & 14.

12

On appeal, Uddin seems to argue that the Board found his claim "waived," and not "summarily dismissed," and that thus we do not review for abuse of discretion. We disagree. While the Board may not have used the magic words "summarily dismiss," it was clearly unable to address Uddin's claim because it could not discern Uddin's grievance with the IJ's CAT ruling, and it dismissed the claim on those grounds.[10] Even when pressed at oral argument, Uddin's attorney was unable to articulate the basis of his objection to the IJ's CAT analysis.[11]

Uddin additionally argues that by challenging the IJ's adverse credibility finding, he implicitly challenged the CAT ruling, since the IJ's CAT ruling had discussed the adverse credibility finding. We do not agree that there was a clear line connecting a challenge to the IJ's credibility analysis to the IJ's CAT analysis, such that the Board should have divined Uddin's argument. In *Lin*, the petitioner made a somewhat similar argument to the effect that when one issue implicates another in the case, raising one of the issues puts the Board on notice as to the other. 543 F.3d at 122. We rejected that argument and do not credit it here. The Board had no way of

---

[10] At oral argument, Uddin's attorney seems to have conceded that the Board in fact "summarily dismissed" the CAT claim, but then later argued that the Board had instead found the claim "waived."

[11] In his brief before us, Uddin stated that his reference to the CAT claim in his brief before the Board is "sufficient for exhaustion." Brief at 11. But exhaustion, which implicates our jurisdiction, *Lin*, 543 F.3d at 120, is not at issue here. Instead, we are assessing whether the Board properly summarily dismissed the CAT claim.

13

knowing that, by challenging the adverse credibility finding, Uddin was challenging the IJ's CAT ruling. Thus, Uddin's CAT claim fails.

### B. *Withholding of Removal*

#### (i) Standard of Review

We review the legal determination of whether a group falls within the definition of an undesignated terrorist organization *de novo*. Findings of fact underlying this determination are reviewed to determine if they are supported by substantial evidence, meaning that we will "uphold the agency's determination unless the evidence would compel any reasonable fact finder to reach a contrary result." *Sesay v. Att'y Gen.*, 787 F.3d 215, 220 (3d Cir. 2015) (quoting *Gonazalez-Posadas v. Att'y Gen.*, 781 F.3d 677, 684 n.5 (3d Cir. 2015)). When, as here, the "BIA's opinion directly states that the BIA is deferring to the IJ, or invokes specific aspects of the IJ's analysis and factfinding in support of the BIA's conclusions," we review both decisions. *Oliva-Ramos v. Att'y Gen.*, 694 F.3d 259, 270 (3d Cir. 2012) (quoting *Voci v. Gonzales*, 409 F.3d 607, 613 (3d Cir. 2005)).

#### (ii) Analysis

As discussed, the Board found that Uddin was ineligible for withholding of relief because he was a member of a Tier III terrorist organization. But while the IJ and Board pointed to evidence of terrorist activity committed by

members of the BNP,[12] it did not, as it has in many of its rulings, discuss whether the specified terrorist acts were

[12] Although there is evidence in the record as to terrorist activity by BNP members from 2013-2015, the record is less clear as to terrorist acts committed by BNP members between 2008 and 2011, when Uddin was a member in Bangladesh. Pressed at oral argument as to what evidence of terrorist acts were in the record while Uddin was in Bangladesh, counsel directed us to a single page from a report by the Immigration and Refugee Board of Canada. AR 237.

That report states that one source consulted reported "135 individuals having been killed and 11,532 persons having been injured due to political violence between January and December 2011." But the report immediately notes thereafter: "Corroborating Information *could not be found* among the sources consulted . . ." AR 237 (emphasis added). Further, as the Government's counsel conceded, the report does not attribute the political violence referenced to the BNP. That this was the most damning evidence the Government could cite at argument from a 734-page record makes us question the BNP's status a terrorist organization during the years 2008-2011. But because Uddin continued his active membership in the BNP even after he arrived in the United States, we also look to the BNP's actions from 2011-2015.

We note, however, that evidence of RAB's violence conduct that predated Uddin's membership in the BNP is not relevant to the determination of the BNP's Tier III status while he was a member. The BNP has not controlled the RAB since approximately two years before Uddin even joined the party. In fact, the Human Rights Watch Report states that since the BNP has been a minority party, the government has

15

actually authorized. Today, we hold that absent such a finding regarding authorization by a group's leaders, Tier III status cannot be assigned to a group. We will thus remand for the Board to address this issue.

We find support for our ruling in the statutory text, the Board's own rulings and those of the Seventh Circuit, and common sense. To start, the relevant statute defines a Tier III terrorist organization as a "*group* of two or more individuals" that engages in terrorist activity, or a group that "has a *subgroup*" that engages in terrorist activity. 8 U.S.C. § 1182(a)(3)(B)(vi)(III) (emphases added). Had the statute stated that a Tier III terrorist organization is "a group *whose members* engage in terrorist activity," then a group's Tier III designation could be based on the individual actions of its members, regardless of authorization. But the text speaks to concerted actions of a group, not uncoordinated activities by individual members: an organization receives Tier III status only if a group *itself* engages in terrorist activity. A rule that there must be evidence of authorization from party leaders is most faithful to that statutory text.

Second, the rule we announce mirrors the Board's own reasoning in the mine-run of its cases involving the BNP's status as a Tier III organization. In fact, in some cases where IJs did not make a finding as to BNP leaders' authorization of allegedly terrorist acts, the Board found error in the IJs' omissions, and remanded to the IJs to take up that very question of authorization. In such cases, the Board bolstered

used the RAB to conduct numerous extra-judicial killings of BNP members. Thus, for purposes of the BNP's status as a terrorist organization, the RAB's conduct cannot be ascribed to that group during the time period relevant to Uddin's case.

16

its reasoning by referencing Seventh Circuit opinions suggesting that some finding on authorization is necessary to assign a group Tier III status. *See Khan v. Holder*, 766 F.3d 689, 699 (7th Cir. 2014) ("An entire organization does not automatically become a terrorist organization just because some members of the group commit terrorist acts. The question is one of authorization."); *Hussain v. Mukasey*, 518 F.3d 534, 538 (7th Cir. 2008) ("An organization is not a terrorist organization just because one of its members commits an act of armed violence without direct or indirect authorization . . . .").

Third, requiring a finding of authorization simply formalizes common sense notions as to what a terrorist organization is. If a single member of the Democratic or Republican Party committed a terrorist act, we would not impute terrorist status to the entire group, absent some showing that party leadership authorized the act. So too here, it cannot be that the acts of any single member of the BNP can transform the organization into a terrorist group.[13] Judge Posner explained why this is so in *Hussain*:

> If an activity is not authorized, ratified, or otherwise approved or condoned by the organization, then the

---

[13] Violent outbreaks by both BNP and AL members seem to color the political landscape of Bangladesh leading up to elections. The BNP and AL are the two major political parties in that country, and dominate political life there. Thus, following the Board's reasoning in this case which suggests that both parties qualify as terrorist organizations, it appears that a large swath of Bengali aliens who are members of these parties would be ineligible for most forms of immigration relief. This gives us pause.

organization is not the actor. It may be liable under the principles of agency law, even criminally liable, for a harm done by one of its employees or other agents, as when an employee commits a tort within the course of his employment although not authorized to do so by his employer. But that does not mean that the employer "engaged in" the employee's act. An organization is not a terrorist organization just because one of its members commits an act of armed violence without direct or indirect authorization, even if his objective was to advance the organization's goals, though the organization might be held liable to the victim of his violent act.

518 F.3d at 538 (citations omitted).

Further, today's ruling should help provide the Board a principled method of adjudicating Tier III cases, an area of law with little guidance from the Courts of Appeals. This dearth of precedential opinions has resulted in highly inconsistent results regarding the BNP's status as a terrorist organization: our preliminary research in preparation for oral argument turned up several Board rulings concluding that the BNP was not in fact a terrorist organization. These conclusions were in stark contrast to the Board's finding in Uddin's case.

Faced with these contradictory opinions, in advance of oral argument we asked the Government to submit *all* Board opinions from 2015-2017 addressing the terrorism bar as it applies to the BNP. (Those opinions are not all publicly available.) The Government's submission—fifty-four opinions in total—did not bolster our confidence in the Board's adjudication of these cases.

In six of the opinions, the Board agreed with the IJ that the BNP qualified as a terrorist organization based on the record in that case. But in at least ten, the Board concluded that the BNP was not a terrorist organization. In at least five cases, the Government did not challenge the IJ's determination that the BNP is not a terrorist organization. And in one case, the Board reversed its own prior determination, finding that that "the Board's last decision incorrectly affirmed the Immigration Judge's finding that the BNP is a Tier III terrorist organization." Many of the cases discussed the BNP's terrorist status during the same time periods, reaching radically different results.

We recognize that the Board's decisions are unpublished, and thus lack precedential value. We also note the Government's argument that the BNP's status as an undesignated terrorist organization is a "case-specific" determination based on the facts presented. That said, something is amiss where, time and time again, the Board finds the BNP is a terrorist organization one day, and reaches the exact opposite conclusion the next.

Even more concerning, the IJ in this case stated that he was "aware of no BIA or circuit court decision to date which has considered whether the BNP constitutes a terrorist organization." AR 68. At the time the IJ ruled, there were several such decisions, and now there are dozens. When asked at oral argument whether the IJ could access unpublished Board decisions regarding BNP's terrorist status, the Government's Attorney responded that he did not know. This is a troubling state of affairs.

19

Still, the rule we announce today does not always require that the Government produce conclusive proof that the leader(s) of a group explicitly sign off on each individual terrorist act at issue. Instead, as the Board itself has opined in several cases, "[e]vidence of authorization may be direct or circumstantial, and authorization may be reasonably inferred from, among other things, the fact that most of an organization's members commit terrorist activity or from a failure of a group's leadership to condemn or curtail its members' terrorist acts." Addendum at 6. As we have stated, what constitutes a Tier III terrorist organization is adjudicated on a case-by-case basis. Accordingly, what constitutes authorization under the rule we announce today must also be determined case-by-case. Whether words, acts, or silences amount to authorization must depend on context, including, but not limited to, the structure of the organization, the relationship between the organization and its members, and the information each has about the other. As long as the agency finds as a matter of fact that the allegedly terroristic acts were authorized by party leaders, we review that determination for clear error.

Because neither the IJ nor the Board in this case addressed whether the terrorist activity was authorized by party leadership,[14] we will grant the petition on the withholding of removal claim and remand. On remand, the

---

[14] Both the IJ and the Board made scattered comments suggesting that authorization might have been an element of their findings. But, unlike in other BIA cases, neither explicitly addressed the issue of authorization. Nor do they affirmatively establish that BNP leaders authorized the actions that were terroristic.

20

Board should determine whether the BNP's leadership has authorized its members to engage in the referenced terrorist activity.

### IV. Conclusion

The INA contemplates that we afford some deference to the Board's expertise in matters of immigration. But when the Board's inconsistency leaves us guessing as to its actual position on a matter, we think it merits a closer look. The question of authorization is, as the Board itself has found, a necessary part of the Tier III inquiry. Thus, we will grant the petition and remand on the withholding claim. On the CAT claim, we will deny the petition.

GREENAWAY, JR., *concurring*.

I join the Court's opinion in full. We hold that groups may only be deemed Tier III terrorist organizations based on the terrorist activities of their members if the groups authorized those activities. I write separately to clarify and expand on the meaning and scope of that holding and its necessary implications.

Where the BIA has applied this authorization requirement, it has generally also interpreted the statute to impose a limiting definition on the word "subgroup."[1] This definition has two features. First, the term "subgroup" covers only "significant" subgroups. *See, e.g.*, Addendum at 8 (BIA opinion, Dec. 16, 2016) (citing H.R. Rep. No. 107-236, at 63 (2001)). Second, the term applies only "where there are reasonable grounds to believe that [the subgroup] is subordinate to, or affiliated with, [the larger group] *and* [the subgroup] is dependent on, or otherwise relies upon, [the larger group] in whole or in part to support or maintain its

---

[1] In these cases, the BIA also tends to adopt an additional limitation from a subsequent Seventh Circuit case, *Khan v. Holder*, 766 F.3d 689, 699 (7th Cir. 2014). A person is not subject to the terrorist bar if they did not know, and reasonably should not have known, that the organization they were a part of was a terrorist organization. 8 U.S.C. § 1182(a)(3)(B)(i)(VI). The Seventh Circuit observed that, in light of the authorization requirement, "a person may not know whether he is supporting a terrorist organization until he knows which acts are authorized." *Khan*, 766 F.3d at 699 (emphasis omitted).

operations." *Id.* (quoting 9 Foreign Affairs Manual § 302.6-2(B)(3)(h)).

These limitations on what can constitute a "subgroup" in this context are interdependent with the authorization requirement and required by our interpretation. A Tier III terrorist organization is "a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in" terrorist activity. 8 U.S.C. § 1182(a)(3)(B)(vi)(III). As a matter of statutory structure, we cannot understand what it means for a group to engage in terrorist activity unless we also understand what it means for a subgroup to do so. If the relevant "subgroup" could be defined as "whichever individuals committed terrorist acts," then every single group (of whatever size, shape, or formality) that happens to have two members committing terrorist acts could be deemed a terrorist organization, regardless of the relationship between the members and the group. Accordingly, a limitation on what it means for a group to engage in terrorist activity requires a concurrent limitation on the meaning of "subgroup." Otherwise, the unauthorized activities of a group's members—which we have held cannot render the group a terrorist organization—could always be re-characterized as the activities of an unorganized subgroup, transforming the group back into a terrorist organization once more. The authorization requirement would not function. Moreover, our concerns about the unintended potential for this statute to be extended to most, if not all, asylum-seekers, would go unaddressed.

Thus, for the same interpretive reasons that we have found that the statute requires authorization,[2] I would adopt the BIA's two limiting definitions of the word "subgroup" as well. I would therefore counsel the BIA, as it applies our holding, to follow not only the holding of this opinion but that holding's necessary corollaries, as it has often done in the past. A group should not be declared a Tier III terrorist organization based on the actions of a subgroup unless that subgroup is "significant" and unless that subgroup "is subordinate to, or affiliated with, [the larger group] *and* [the subgroup] is dependent on, or otherwise relies upon, [the larger group] in whole or in part to support or maintain its operations." Addendum at 8 (BIA opinion, Dec. 16, 2016) (quoting 9 Foreign Affairs Manual § 302.6-2(B)(3)(h)).

---

[2] Indeed, any interpretive path leads to this same result. To the extent that the Seventh Circuit originally derived this authorization requirement from principles of constitutional avoidance, *Hussain v. Mukasey*, 518 F.3d 534, 538 (7th Cir. 2008) (citing *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 930-32 (1982)), a failure to limit the meaning of "subgroup" would also raise those same constitutional concerns. The point is that so long as "subgroup" can mean "members," there can be no effective distinction between the group's activities and its members' activities, under any framework.