[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-13287

_____

D.C. Docket No. 1:17-cv-22237-JLK


MAZHARUL ISLAM,

                                                    Plaintiff-Appellant,


versus


SECRETARY, DEPARTMENT OF HOMELAND SECURITY,
ACTING DIRECTOR, U.S. CITIZENSHIP AND IMMIGRATION SERVICES,
DEPUTY DIRECTOR MARK J. HAZUDA,
in his capacity as USCIS Nebraska Service
Center Director,
DIRECTORY GREGORY A. RICHARDSON,
in his capacity as USCIS Texas Service
Center Director,
DIRECTOR DONALD NEUFELD,
in his capacity as USCIS Service Center
Operations Associate Director,
JENNIFER B HIGGINS,
in her capacity as USCIS Refugee, Asylum,
and International Operations Associate Director,

                                                    Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(May 20, 2021)

Before WILLIAM PRYOR, Chief Judge, and JORDAN and MARCUS, Circuit Judges.

JORDAN, Circuit Judge:

The so-called "terrorism bar" in the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(3)(B), identifies three categories, commonly referred to as "tiers," of terrorist organizations. Tier I terrorist organizations are those designated by the Secretary of State in accordance with 8 U.S.C. § 1189. *See* § 1182(a)(3)(B)(vi)(I). Tier II terrorist organizations are those designated "by the Secretary of State in consultation with or upon the request of the Attorney General or the Secretary of Homeland Security." § 1182(a)(3)(B)(vi)(II). Tier III terrorist organizations (the category at issue in this case) are undesignated. *See* § 1182(a)(3)(B)(vi)(III). Whether an entity qualifies as a Tier III terrorist organization is therefore determined on a case-by-case basis. *See Uddin v. Att'y. Gen. U.S.*, 870 F.3d 282, 285 (3d Cir. 2017). Membership in, or the knowing provision of material support to, a Tier I, Tier II, or Tier III terrorist organization renders an alien inadmissible under the INA. *See* § 1182(a)(3)(B). And inadmissibility generally precludes an adjustment of status

2

(e.g., to lawful permanent resident). *See* 8 U.S.C. § 1159(b)(5); 8 C.F.R. § 209.2(a)(1)(v).[1]

After he left Bangladesh, Mazharul Islam obtained asylum in the United States. He later sought to adjust his status to lawful permanent resident. United States Citizenship and Immigration Services ruled, however, that he was ineligible for adjustment of status due to his membership in a Tier III terrorist organization—the Bangladesh Nationalist Party—and his personal engagement in terrorist activity.

Mr. Islam unsuccessfully challenged USCIS' decision in the district court. He now appeals the district court's grant of summary judgment in favor of the government. Following a review of the record, and with the benefit of oral argument, we affirm.

## I

We summarize the facts in the light most favorable to Mr. Islam. *See Warshauer v. Solis*, 577 F.3d 1330, 1335 (11th Cir. 2009).

## A

The Bangladesh Nationalist Party, or BNP, is one of the two largest political parties in Bangladesh. The other is the Awami League, or AL.

---

[1] Unless otherwise noted, statutory references are to Title 8 of the United States Code.

From 1982 to 1991, a military regime governed Bangladesh. Public uprisings beginning in 1990 led to the fall of the military regime and the restoration of democracy in 1991. Since then, the BNP and the AL have alternated periods of government control. Despite their participation in the Bangladeshi democratic process, both parties have also resorted to violence, corruption, and other illegal means to obtain, maintain, and consolidate political power.

Mr. Islam is a native and citizen of Bangladesh, and he has been a member of the BNP or its student organization since 1995. Around that time he started "to get really active in BNP political activities . . . [including] working with local BNP youth groups, going to meetings, and passing out BNP flyers." D.E. 18-6 at 27. When he began his college studies, he "became even more active than before in BNP politics." *Id.*

After college, Mr. Islam bought a tea shop, which he operated from 2001 to 2011. The tea shop served as a BNP meeting place, and he posted BNP flyers there and campaigned for BNP political candidates. On August 1, 2011, Mr. Islam became the publicity secretary for his local BNP chapter and was responsible for putting up posters advertising BNP events in the local area.

On August 20, 2011, while closing his tea shop for the day, Mr. Islam was assaulted by a group of AL members. Aware of his involvement with the BNP, the group beat him with hockey sticks and threw Molotov cocktails at his tea shop.

4

Mr. Islam escaped with the help of local villagers, but not before suffering burns and a broken finger. Because he tried to report the attack to the police, AL members ransacked his parents' house and threatened to kill him. As a result, the family agreed that he should leave the country for his safety, and he departed on September 7, 2011.

Three months later, Mr. Islam entered the United States without inspection, crossing the border at Hidalgo, Texas. He was detained by U.S. Border Patrol shortly thereafter.

An asylum officer conducted a credible fear interview to determine whether Mr. Islam was eligible to apply for asylum. During the interview, the asylum officer asked a series of questions related to his background, the reasons he left Bangladesh, his political affiliations, and his entry into the United States. As relevant here, the asylum officer asked Mr. Islam if he had ever belonged to a group accused of using violence. He responded "no." The asylum officer found that Mr. Islam had established a credible fear of persecution, and that he did not appear to be subject to any bars to asylum or withholding of removal.

In August of 2012, Mr. Islam filed an application for asylum with USCIS. He confirmed that he belonged to the BNP and denied ever ordering, inciting, or assisting in causing harm to any persons because of their political opinions. He also

attached an affidavit to his asylum application, in which he detailed his involvement with the BNP and the reasons he left Bangladesh.

At the asylum hearing, neither the parties nor the immigration judge discussed whether Mr. Islam was a member of a terrorist organization or had engaged in terrorist activity. The immigration judge granted asylum to Mr. Islam, and the government did not appeal.

**B**

In January of 2015, Mr. Islam filed an application with USCIS to adjust his status to lawful permanent resident. USCIS sent him a request for evidence, asking for information about his involvement with the BNP—including whether he had contributed financially, held official positions, received military-type training, or participated in armed conflict on its behalf.

Understanding that USCIS' request evinced a concern with his membership in the BNP, Mr. Islam responded with three main arguments. First, the doctrine of issue preclusion barred USCIS from making any finding that would contradict the immigration judge's asylum order. Second, USCIS did not have any lawful basis to find that the BNP met the definition of a Tier III terrorist organization under § 1182(a)(3)(B)(vi)(III). Third, the statutory definition of a Tier III terrorist organization was vague and overbroad, and therefore void.

USCIS then sent Mr. Islam a notice of intent to deny his application for adjustment of status. It explained that it was considering denying the application under § 1182(a)(3)(B), which deems inadmissible (and therefore ineligible for adjustment) those aliens who have participated in, or have certain connections to entities or people who participate in, terrorism. Relying on governmental, NGO, and press reports, and on the account by Mr. Islam of his actions related to his BNP membership, USCIS was considering finding that he was a member of a Tier III terrorist organization and that he had himself engaged in terrorist activity. *See* § 1182(a)(3)(B)(i)(I) & (VI).

Mr. Islam replied to the notice with the same arguments he had presented in his response to the request for evidence. He asserted that none of the evidence cited in USCIS' notice credibly demonstrated that the BNP or its leadership had authorized, condoned, or sanctioned any violence; that the doctrine of issue preclusion barred USCIS from re-adjudicating whether he was inadmissible under the terrorism bar, as the issue had already been decided by the immigration judge in the asylum proceeding; and that the definition of a Tier III terrorist organization in § 1182(a)(3)(B)(vi)(III) was vague and overbroad.

USCIS denied Mr. Islam's application for adjustment of status on two grounds. USCIS found that Mr. Islam was a member of a Tier III terrorist

organization, i.e., the BNP. It also found that Mr. Islam had himself engaged in terrorist activity by providing material support to the BNP.[2]

While the administrative process was ongoing, Mr. Islam filed a petition for a writ of mandamus requesting that the district court compel USCIS to adjudicate his application for adjustment of status. After USCIS issued its decision, Mr. Islam filed an amended complaint in the district court, requesting a declaratory judgment holding (1) that USCIS was barred by the doctrine of issue preclusion from applying the INA's terrorism bar to him, (2) that USCIS erred in finding that the BNP was a Tier III terrorist organization, and (3) that the statutory definition of a Tier III terrorist organization was vague and overbroad.

The parties subsequently filed cross-motions for summary judgment. The government sought summary judgment on each count of Mr. Islam's complaint. A magistrate judge issued a report recommending that the district court grant the government's motion and deny Mr. Islam's motion. In response, Mr. Islam filed objections to the report and recommendation.

The district court issued an order adopting and affirming the magistrate judge's report and recommendation. The court first rejected the issue preclusion argument, concluding that whether the terrorism bar applied to Mr. Islam had not

---

[2] We discuss USCIS' findings in more detail later in the opinion.

been "actually litigated" in the asylum proceeding. The court also ruled that USCIS'

determination that Mr. Islam was ineligible to adjust his status—due his being a

member of the BNP, a Tier III terrorist organization, and to his provision of material

support to the BNP—was supported by substantial evidence and was not arbitrary

or capricious. Finally, the court held that the definition of a Tier III terrorist

organization was not unconstitutionally vague or overbroad.

## II

The INA is a complex statutory scheme, operating through numerous

interlocking, primary, subordinate, and/or cross-referencing sections and

subsections. Due to that nesting-doll structure, we consider it helpful to begin by

identifying the INA provisions that are relevant to Mr. Islam's case, and explaining

how they correlate and were applied by USCIS.

The INA permits the Secretary of Homeland Security or the Attorney General

to adjust the status of an alien who has been granted asylum to that of lawful

permanent resident, so long as the asylee meets certain requirements. *See* § 1159(b).

One of those requirements is that the asylee be considered admissible under the INA

at the time of examination for adjustment. *See* § 1159(b)(5).

Certain classes of aliens are considered inadmissible under the INA. One of

those classes consists of aliens encompassed by the INA's terrorism bar. *See*

§ 1182(a)(3)(B). The terrorism bar, for its part, identifies nine categories of aliens

9

who fall within its scope. *See id.* To recap, USCIS determined that Mr. Islam fell within two of those categories.

First, USCIS found Mr. Islam inadmissible for being a member of a Tier III terrorist organization. *See* § 1182(a)(3)(B)(i)(VI). A Tier III terrorist organization is "an organization . . . that is a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in [certain activities, including 'terrorist activity.']" § 1182(a)(3)(B)(vi)(III). The INA's terrorism bar defines "terrorist activity" as, among other things, any activity that is "unlawful" and involves the

> use of any . . . . explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property . . . . [and] [a] threat, attempt, or conspiracy to do any of the foregoing.

§ 1182(a)(3)(B)(iii)(V)(b) & (VI).

Relying on the evidence cited in its notice of intent to deny, USCIS determined that over many years BNP members had engaged in frequent and widespread acts of violence that constituted terrorist activity as defined in § 1182(a)(3)(B)(iii)(V)(b) & (VI). USCIS also found that BNP leadership sometimes participated in or threatened the use of violence. Moreover, USCIS found that there was no evidence that BNP leadership took steps to prevent BNP members

from engaging in terrorist activity or routinely sanctioned members for doing so. As a result, the BNP had at least tacitly authorized its members' terrorist activity. By authorizing that terrorist activity, the BNP itself engaged in it, making it a Tier III terrorist organization. And because Mr. Islam was a member of the BNP, USCIS concluded that he was ineligible for adjustment of status.

Second, USCIS found Mr. Islam inadmissible for having personally engaged in terrorist activity. *See* § 1182(a)(3)(B)(i)(I). As relevant here, under the terrorism bar a person engages in terrorist activity when "[he] commit[s] an act that [he] knows, or reasonably should know, affords material support . . . to a [Tier III terrorist organization], or to any member of such an organization." § 1182(a)(3)(B)(iv)(VI)(dd). USCIS determined that Mr. Islam had provided material support to the BNP by using his tea shop as a BNP meeting place, distributing BNP flyers, and putting up posters of local BNP events.

Under § 1159(b)(5), USCIS' determination that Mr. Islam was inadmissible under the terrorism bar resulted in his ineligibility for adjustment of status.

### III

On appeal, Mr. Islam argues that the district court erred in granting summary judgment in favor of the government. Our review is, except where noted, plenary. *See Salmeron-Salmeron v. Spivey*, 926 F.3d 1283, 1286 (11th Cir. 2019).

11

**IV**

Mr. Islam first argues that issue preclusion barred USCIS from determining that he was inadmissible under the INA's terrorism bar.  The district court concluded that this issue had not been "actually litigated" in the asylum proceeding because it had not been contested, debated, or raised there. As a result, issue preclusion did not bar USCIS from adjudicating the application of the terrorism bar. We agree with the district court.

As noted above, we generally review de novo a district court's grant of summary judgment. *See*, *e.g.*, *Barnett v. MacArthur*, 956 F.3d 1291, 1296 (11th Cir. 2020).   But where the summary judgment order addressed issue preclusion, we review for clear error the court's factual determination as to whether an issue was "actually litigated" in a prior proceeding.   *See Vazquez v. Metropolitan Dade County*, 968 F.2d 1101, 1106 (11th Cir. 1992).

"A final decision by an immigration judge has a preclusive effect on future litigation and agency decisions." *Amrollah v. Napolitano*, 710 F.3d 568, 571 (5th Cir. 2013). *See also Astoria v. Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) ("[W]here a common-law principle is well established, as are the rules of preclusion, the courts may take it as given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident.") (citations and internal quotation marks omitted). The federal

12

doctrine of issue preclusion "forecloses relitigation of an issue of fact or law that has been litigated and decided in a prior suit." *CSX Transp., Inc. v. Brotherhood of Maint. of Way Emps.*, 327 F.3d 1309, 1317 (11th Cir. 2003) (internal quotation marks omitted). For federal issue preclusion to bar relitigation of a particular issue, (1) the relevant issue must be identical to the one involved in the prior proceeding, (2) the issue must have been actually litigated in the prior proceeding, (3) the determination of the issue must have been a critical and necessary part of the judgment in the prior proceeding, and (4) the party against whom the earlier decision is asserted must have had a full and fair opportunity to litigate the issue in the prior proceeding. *See id.*

Mr. Islam argues that whether the BNP is a Tier III terrorist organization—and thus whether he is a member of, or provided material support to, such an organization—was actually litigated in the asylum proceeding. In support, he points to statements he made in his asylum application, affidavit, and credible fear interview, as well as to the asylum officer's finding that there did not appear to be a bar to asylum. According to Mr. Islam, that evidence "amounted to 'litigation.'" Appellant's Br. at 18. We are not persuaded.

A matter is actually litigated for purposes of issue preclusion when it is "properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined." *Pleming v. Universal-Rundle Corp.*, 142 F.3d 1354, 1359 (11th

13

Cir. 1998) (quoting Restatement (Second) of Judgments § 27 cmt. d (1982)). *Accord Janjua v. Neufeld,* 933 F.3d 1061, 1066 (9th Cir. 2019); *Raspanti v. Keaty (In re Keaty)*, 397 F.3d 264, 272 (5th Cir. 2005); *McLaughlin v. Bradlee*, 803 F.2d 1197, 1202 (D.C. Cir. 1986). In analyzing whether Mr. Islam's inadmissibility under the terrorism bar was actually litigated in the asylum proceeding, we find the Ninth Circuit's reasoning in *Janjua* persuasive.

In *Janjua*, an alien sought asylum due to persecution he had suffered in Pakistan because of his membership in a particular organization. *See Janjua*, 933 F.3d at 1063. At one point during the asylum hearing, the government asked about the organization's reputation for violence and cited to some supporting documents. *See id.* But the issue of whether the organization qualified as a terrorist organization was never raised or discussed. *See id.* The immigration judge granted the alien asylum, but when he applied for adjustment of status, USCIS declared him inadmissible for having provided material support to a terrorist organization. *See id.* at 1064. The alien argued that whether he was inadmissible under the terrorism bar had been decided in his asylum proceeding, and that the doctrine of issue preclusion therefore barred USCIS from re-adjudicating the issue. *See id.*

The Ninth Circuit, however, held that issue preclusion did not apply because the alien's inadmissibility under the terrorism bar had not been actually litigated in the asylum proceeding. *See id.* at 1068–69. Neither of the critical issues—whether

14

the organization qualified as a terrorist organization or whether the alien had engaged in terrorist activity—had been raised or submitted for determination by the parties in his asylum proceeding. *See id.* at 1067. Additionally, although the alien's membership in and work for the organization (including whether he had used violence to further the organization's goals) had been discussed at the asylum hearing, these topics had been explored to determine fear of persecution as opposed to inadmissibility under the terrorism bar. *See id.* at 1067–68. Indeed, "no one raised, or even hinted at, these topics as potential grounds for inadmissibility under [the terrorism bar]." *Id.* at 1067.

As in *Janjua*, no one raised or submitted for determination at Mr. Islam's asylum hearing whether the BNP qualified as a Tier III terrorist organization, let alone whether Mr. Islam had provided material support to such an organization. Mr. Islam, moreover, points to nothing in the record indicating that evidence relevant to those subjects was discussed during the asylum hearing. Instead, the statements that he relies on were ones he or the asylum officer made prior to the hearing. To the extent that the immigration judge considered those statements during the asylum proceeding, he did so only to determine whether Mr. Islam had a credible fear of persecution.

Mr. Islam cites to *Amrollah v. Napolitano*, 710 F.3d at 571, where the Fifth Circuit held that an alien's inadmissibility under the terrorism bar had been actually

litigated in a prior asylum proceeding. The case, however, is distinguishable on its facts.  In *Amrollah*, the Fifth Circuit concluded that the "actually litigated" element of issue preclusion was satisfied as to the terrorism bar because "[t]he government cross-examined [the alien] extensively about his support of the mujahedeen movement and [the relevant organization] during the asylum proceeding." *Id.* Additionally, the immigration judge had explicitly found that the alien's testimony confirmed that he had not supported any acts of violence that would make him ineligible for asylum, in spite of the government's suggestion otherwise. *See id.* at 570.  That record is different than the one before us.  Mr. Islam was not cross-examined on his BNP membership or whether he provided material support to the BNP. Nor did the government suggest during the asylum proceeding that he might be inadmissible under the terrorism bar. Finally, unlike the immigration judge in *Amrollah*, the immigration judge here made no mention of the terrorism bar in his one-page order granting asylum.

We discern no clear error in the district court's determination that Mr. Islam's inadmissibility under the terrorism bar was not actually litigated during the asylum proceeding, and reject the issue preclusion claim. Given our conclusion, we do not address the other requirements of issue preclusion.

V

Mr. Islam next argues that, in violation of his due process rights under the Fifth Amendment, the definition of a Tier III terrorist organization under § 1182(a)(3)(B)(vi)(III) and the definition of "terrorist activity" under § 1182(a)(3)(B)(iii)(V)(b) & (VI) are unconstitutionally overbroad and vague. We address each of these arguments below.

A

It is unclear whether Mr. Islam is asserting that the statutory provisions in question are unconstitutional under the First Amendment overbreadth doctrine, or whether he is simply using the words "broad" and "overbroad" to buttress his vagueness argument. If it is the former, Mr. Islam's overbreadth arguments fail at the threshold.

For starters, Mr. Islam has abandoned any argument that the definition of a Tier III terrorist organization fails under overbreadth principles. He mentions the supposed overbreadth of § 1182(a)(3)(B)(vi)(III) in his initial brief only in passing, without developing any substantive arguments. And he does not quote or discuss the First Amendment overbreadth standard, which is that "a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (citation omitted).

17

"We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority." *Sapuppo v. Allstate Floridian Ins. Co.,* 739 F.3d 678, 681 (11th Cir. 2014). Mr. Islam's fleeting references to § 1182(a)(3)(B)(vi)(III) being "broad" and "overbroad" constitute abandonment of any overbreadth claim.

In addition, Mr. Islam has waived any challenge to the definition of "terrorist activity" under § 1182(a)(3)(B)(iii)(V)(b) & (VI), because he intentionally relinquished it in the district court. *See United States v. Gonzalez*, 834 F.3d 1206, 1217 (11th Cir. 2016) ("[W]aiver is the intentional relinquishment or abandonment of a known right. If a party waives an argument in the district court, we will not review it on appeal.") (citations and internal quotation marks omitted). In his objections to the magistrate judge's report and recommendation, Mr. Islam told the district court that he was not challenging the definition of "terrorist activity" and confirmed that the definition of a Tier III terrorist organization under § 1182(a)(3)(B)(vi)(III) "[was] the only part of the statute in dispute." D.E. 29 at 9. In doing so, he waived any overbreadth challenge to § 1182(a)(3)(B)(iii)(V)(b) & (VI).

**B**

Mr. Islam asserts that the definitions of a Tier III terrorist organization, *see* § 1182(a)(3)(B)(vi)(III), and "terrorist activity," *see* § 1182(a)(3)(B)(iii)(V)(b) &

18

(VI), are unconstitutionally vague.  We reject the first argument on the merits, and conclude that the second argument has been waived.

## 1

A claim that a statute is vague, and therefore unconstitutional, presents a question of law subject to plenary review. *See Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1427 (11th Cir. 1998).   A law is unconstitutionally vague when "it fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). Where, as here, a vagueness challenge does not involve the First Amendment, the statute in question is generally analyzed on an as-applied basis. *See Maynard v. Cartwright*, 486 U.S. 356, 361 (1988); *Village of Hoffman Estates v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 n.7 (1982). The questions for us, then, are whether §§ 1182(a)(3)(B)(vi)(III) and 1182(a)(3)(B)(iii)(V)(b) & (VI) are sufficiently clear in their application to Mr. Islam's case. *See Holder v. Humanitarian L. Project*, 561 U.S. 1, 21 (2010).

As to the definition of a Tier III terrorist organization, Mr. Islam claims that it is unconstitutionally vague because it does not indicate how an organization itself—as opposed to its members or leaders—engages in the prohibited conduct. To recall, a Tier III terrorist organization is defined as "an organization . . . that is a group of two or more individuals, whether organized or not, which engages in, or

19

has a subgroup which engages in [certain activities, including 'terrorist activity.']" § 1182(a)(3)(B)(vi)(III). Because that provision requires an entity itself to have engaged in terrorist activity but does not indicate how the entity can do so, Mr. Islam says that it is vague and therefore void.

We hold that an organization engages in terrorist activity for the purposes of § 1182(a)(3)(B)(vi)(III) when its members perpetrate terrorist activity and its leadership authorizes such conduct expressly or tacitly. The text of § 1182(a)(3)(B)(vi)(III) "speaks to concerted actions of a group, not uncoordinated activities by individual members: an organization receives Tier III status only if a group *itself* engages in terrorist activity." *Uddin*, 870 F.3d at 290. Thus, "[a] rule that there must be evidence of authorization from party leaders is most faithful to that statutory text." *Id.* "If an activity is not authorized, ratified, or otherwise approved or condoned by the organization, then the organization is not the actor." *Hussain v. Mukasey*, 518 F.3d 534, 538 (7th Cir. 2008). Authorization must be determined on a case-by-case basis, and may be inferred from, among other things, "the fact that most of an organization's members commit terrorist activity or from a failure of a

group's leadership to condemn or curtail its members' terrorist acts." *Uddin*, 870 F.3d at 292 (internal quotation marks omitted).[3]

Our holding does not mean that an organization qualifies as a Tier III terrorist organization if it fails to prevent one or a few terrorist acts by its members or fails to stop a single member from committing terrorist acts. Indeed, "[i]f a single member of the Democratic or Republican Party committed a terrorist act, we would not impute terrorist status to the entire group, absent some showing that party leadership authorized the act." *Id.* at 290. *See also Khan v. Holder*, 766 F.3d 689, 699 (7th Cir. 2014) ("An entire organization does not automatically become a terrorist organization just because some members of the group commit terrorist acts. The question is one of authorization."). But when the terrorist activity of its members is recurrent and extends over a prolonged period, and leadership's failure to curtail that activity is likewise consistent, a trier of fact can reasonably infer that the organization authorized its members' terrorist activity.

As applied to Mr. Islam and the BNP, § 1182(a)(3)(B)(vi)(III) is not unconstitutionally vague. "[T]he vagueness doctrine bars enforcement of a statute which either forbids or requires the doing of an act in terms so vague that men of

---

[3] In his initial brief, Mr. Islam recognizes this case law but argues against it because interpreting and applying an authorization requirement would be problematic. He does not, however, raise a convincing substantive challenge to the analyses of the Third and Seventh Circuits.

21

common intelligence must necessarily guess at its meaning and differ as to its application." *United States v. Lanier*, 520 U.S. 259, 266 (1997) (internal quotation marks omitted). Here, USCIS found that BNP members had repeatedly and for a prolonged period—from the mid-1990s to 2015—engaged in conduct that constituted terrorist activity, and that BNP leadership had consistently and systematically failed to curtail such activity. A person of common intelligence would have been on fair notice that the BNP could meet the definition of a Tier III terrorist organization. And even if, in the abstract, § 1182(a)(3)(B)(vi)(III) suffers from some ambiguity, *see Hussain*, 518 F.3d at 538, the decisions of our sister circuits provided fair warning that the BNP falls within the scope of the terrorism bar. *See Uddin*, 870 F.3d at 290; *Khan*, 766 F.3d at 699; *Hussain*, 518 F.3d at 538. *See also Lanier*, 520 U.S. at 266 ("clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute").[4]

Mr. Islam argues in his reply brief that "only *direct* authorization, such as verbal or written permission, orders, or instructions to carry out terrorist activity," can lead to a Tier III terrorist organization classification because "[s]uch [a] definition is clear; it is just; it is rational; and it can be proved or disproved." Appellant's Reply Br. at 14–15. Establishing the existence (or lack thereof) of

---

[4] Our general statements about the BNP should not be read as suggesting that Tier III status can be determined on anything other than a case-by-case basis.

22

explicit authorization may be more straightforward than establishing the existence (or lack thereof) of tacit authorization, but this does not make § 1182(a)(3)(B)(vi)(III), as construed, unconstitutionally vague.  Difficulty in proof does not equate to unconstitutional vagueness.  Indeed, in some contexts we consider entities which tacitly authorize or ratify conduct to themselves be at fault, and that cuts against Mr. Islam's contention that a tacit authorization requirement is unclear, irrational, and unconstitutional. *Cf. Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987) ("A municipality's failure to correct the constitutionally offensive actions of its police department may rise to the level of a custom or policy [under 42 U.S.C. § 1983] if the municipality tacitly authorizes these actions[.]") (internal quotation marks omitted).

**2**

That leaves Mr. Islam's vagueness challenge to the definition of "terrorist activity." That, term, again, is defined as "any activity which is unlawful" and which involves the use of explosives, firearms, weapons, or dangerous devices—"other than for mere personal monetary gain"—"with  intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property," as well as a "threat, attempt, or conspiracy" to do any of these acts. *See* § 1182(a)(3)(B)(iii)(V)(b) & (VI).

This definition is problematic, says Mr. Islam, because it encompasses actions that no reasonable person would define as terrorist activities. He argues, for example, that there is no self-defense exception. And he insists that it is irrational to use such a broad definition when someone in his position may be associated with a terrorist organization just because others in the organization may have committed prohibited acts. *See* Appellant's Br. at 31.

Mr. Islam's vagueness challenge to § 1182(a)(3)(B)(iii)(V)(b) & (VI) fails at the outset. As we explained earlier, he intentionally relinquished any challenge to the definition of "terrorist activity" in the district court. *See Gonzalez*, 834 F.3d at 1217. He therefore cannot present the vagueness challenge on appeal.

## VI

As to USCIS' substantive determination that the BNP qualified as a Tier III terrorist organization, Mr. Islam argues that there is no evidence that BNP leaders authorized terrorist activity that may have been carried out by its members. According to Mr. Islam, USCIS' decision is arbitrary and capricious. We disagree.

In conducting de novo review of the district court's grant of summary judgment, we apply the same underlying standard used by the district court. *See Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1233 (11th Cir. 2001). The relevant provision of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), authorizes a court to set aside an agency's action if it is "arbitrary,

24

capricious, an abuse of discretion, or otherwise not in accordance with law." Under that deferential standard, we assess whether the agency's decision demonstrates a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). *See also BBX Cap. v. Fed. Deposit Ins. Corp*, 956 F.3d 1304, 1314 (11th Cir. 2020). Our role "is to ensure that the agency came to a rational conclusion, not to conduct [our] own investigation and substitute [our] own judgment for the administrative agency's decision." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) (internal quotation marks omitted).[5]

USCIS determined that the BNP qualified as a Tier III terrorist organization, finding (1) that over many years BNP members had engaged in frequent and widespread conduct that constituted terrorist activity, (2) that BNP leadership sometimes participated in or threatened the use of violence, and (3) that there was no evidence that BNP leadership took steps to prevent members from engaging in terrorist activity or routinely sanctioned members for doing so. Consequently,

---

[5] Under § 706(2) of the APA, courts can set aside agency actions in six circumstances. We understand Mr. Islam to argue that USCIS' decision is arbitrary and capricious in violation of § 706(2)(A) because he cites only the standard of review for that provision, argues that USCIS' determinations are not rational, and concludes that "USCIS violated the APA in making the irrational, arbitrary, and capricious finding that the BNP meets the definition of a Tier III terrorist group." Appellant's Br. at 34. Mr. Islam summarily mentions that USCIS' findings and conclusions are not supported by substantial evidence, *see* § 706(2)(E), but does not cite or discuss that standard. We therefore do not address it. *See Sapuppo,* 739 F.3d at 681.

USCIS determined that the BNP had at least tacitly authorized its members' terrorist activity, thereby itself engaging in terrorist activity.

We conclude that USCIS rationally found that BNP members had engaged in conduct that constituted "terrorist activity" under § 1182(a)(3)(B)(iii)(V)(b) & (VI). For example, a Human Rights Watch report on Bangladesh's 1996 elections explained that BNP members had engaged in wanton acts of violence and intimidation. Specifically, BNP and AL members "ha[d] used crude 'cocktail' bombs, knives, and guns against one another and the police, causing scores of casualties." D.E. 18-3 at 4. Reuters further reported that a 1997 strike called by the BNP had been enforced by strikers who set off dozens of homemade bombs. The Committee to Protect Journalists reported that, in 1999, a group of BNP demonstrators stormed an office building housing a local newspaper. Armed with explosives, guns, rocks, and sticks, the demonstrators injured eighteen newspaper staffers and damaged fourteen newspaper vehicles. A Jane's Sentinel Security Assessment reported that BNP protests leading up to the 2014 elections resulted in hundreds of deaths, and that protesters threw rocks and Molotov cocktails at government property. That evidence was sufficient for USCIS to rationally conclude that BNP members had engaged in conduct that constituted terrorist activity under § 1182(a)(3)(B)(iii)(V)(b) & (VI).

26

USCIS' determination that BNP leaders had tacitly authorized its members' terrorist activity was also rational. Here too, the 1996 Human Rights Watch report explained that, after that year's election, "neither the BNP nor the [AL] ha[d] taken affirmative steps to ensure that their supporters and party cadres desist[ed] from the kind of violence that characterized their earlier political feuding." D.E. 18-3 at 4. After the 1999 attack on a local newspaper, the newspaper's editor stated that the attack had been spearheaded by the BNP's press advisor. In addition, other journalists had reported being threatened by local BNP leaders to not publish reports critical of the BNP. Against this backdrop, USCIS explained that there was no evidence in the record that BNP leadership had routinely or systematically sanctioned members for engaging in terrorist activity. Given the frequent and widespread nature of the terrorist activity perpetrated by BNP members, all of this evidence was sufficient to render rational USCIS' determination that the BNP had tacitly authorized its members' terrorist activity.

Mr. Islam presents a series of factual arguments that, while individually accurate, do not change the outcome. For example, he correctly points out that the BNP has denied involvement in intimidation and violence. Yet if we were to re-weigh that fact (and others) along with the evidence supporting USCIS' tacit authorization finding, we would be engaging in precisely the type of investigation and substitution of judgment that we cannot undertake under § 706(2)(A). *See Sierra*

27

*Club*, 526 F.3d at 1360. We are limited to considering whether an agency's determination bears a rational connection to the facts found. *See State Farm*, 463 U.S. at 43.

We recognize that there is evidence demonstrating that the AL, when in power, persecuted the BNP and its members. But though that evidence may suggest that the AL is itself a Tier III terrorist organization, it does not exempt the BNP from such classification.

Mr. Islam also contends that USCIS and the district court failed to fully address his argument that he did not know and should not reasonably have known that the BNP qualified as a Tier III terrorist organization. We agree with the government, however, that Mr. Islam has forfeited his lack-of-knowledge argument by not raising it in the district court. *See Access Now, Inc. v. Sw. Airlines Co*., 385 F.3d 1324, 1331 (11th Cir. 2004). In any event, USCIS did explain its conclusion that Mr. Islam had not met his burden of proving that he did not know and should not reasonably have known that the BNP qualified as a Tier III terrorist organization. *See* D.E. 18-1 at 9.  Mr. Islam's argument on appeal—which does not identify any substantive error in USCIS' analysis—is perfunctory and therefore insufficient. *See Sapuppo,* 739 F.3d at 681. Thus, we leave for another day what a person must show to establish that he "did not know, and should not reasonably have known, that the organization was a terrorist organization." § 1182(a)(3)(B)(iv)(VI)(dd).

28

Applying the "exceedingly deferential" standard of review under § 706(2)(A) of the APA, *see Sierra Club*, 526 F.3d at 1360, we hold that USCIS' conclusion that the BNP authorized its members' terrorist activity—and thus qualified as a Tier III terrorist organization—is not arbitrary and capricious. Mr. Islam's APA challenge therefore fails.[6]

## VII

We affirm the district court's grant of summary judgment in favor of the government on Mr. Islam's claims.

**AFFIRMED**.

---

[6] As indicated earlier, USCIS found Mr. Islam inadmissible on two grounds—that he is a member of a Tier III terrorist organization and that he engaged in terrorist activity by providing material support to a Tier III terrorist organization. *See* § 1182(a)(3)(B)(i)(VI) & (iv)(VI)(dd). Both grounds depend on the BNP qualifying as a Tier III terrorist organization, and it is that determination by USCIS that Mr. Islam challenges on appeal. He does not contest USCIS' finding that he provided material support to the BNP. Hence, our affirmance under § 706(2)(A) of USCIS' finding that the BNP qualifies as a Tier III terrorist organization is dispositive as to both grounds of inadmissibility.